Robert B. ALEXANDER, et al., Plaintiffs,

v.

NATIONAL FARMERS ORGANIZATION, et al., Defendants and Counterclaim Plaintiffs,

v.

ASSOCIATED MILK PRODUCERS, INC., et al., Counterclaim Defendants.

No. 19191–A–1.

United States District Court, W.D. Missouri, W.D.

June 17, 1986.

David A. Donohoe, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for National Farmers' Organization, defendant and counterclaim plaintiff.

Donald W. Barnes, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., and Colvin A. Peterson, Jr., Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Associated Milk Producers, Inc., counterclaim defendants.

Sydney Berde, Berde & Hagstrom, P.A., St. Paul, Minn., for Central Milk Producers Co-op., counterclaim defendant.

George A. Leonard, Shughart, Thomson & Kilroy, and Major W. Park, Jr., Gage & Tucker, Kansas City, Mo., for Mid-America Dairymen, Inc., counterclaim defendants.

## MEMORANDUM AND ORDERS DIRECTING FURTHER PROCEEDINGS

JOHN W. OLIVER, Senior District Judge.

### I.

On August 9, 1985 this Court entered an agreed order which established the time schedule under which the following matters would be submitted for this Court's consideration: (1) NFO's attorneys' fee petition, (2) NFO's Rule 37 motion, (3) AMPI's Rule 37 motion,[1] and (4) NFO's bill of costs. By agreement of the parties, the deadline for the last filing to be made under that order was extended to February 10, 1986. On August 27, 1985 NFO filed a motion for clarification of this Court's ruling denying an award of damages. That motion has been fully briefed on a separate schedule and will be ruled.[2]

NFO's motion for clarification will be denied. Both NFO's Rule 37 motion and AMPI's motion for sanctions will be granted. Both NFO's attorneys' fee petition and its separate bill of costs motion will be denied without prejudice.

### II.

Consistent with the Supreme Court's admonition to avoid a second major litigation stated in *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), the August 9, 1985 order provided that the parties would conduct appropriate conferences during the month of September, 1985, for the purpose of reaching an agreement in regard to the amounts to be awarded in regard to four matters covered by that order. On September 27, 1985, counsel reported that they had conferred on September 18, 19, and 20, 1985 in Washington, D.C. as directed in the August 9, 1985 order and that they had been able

---

**1.** AMPI's motion for sanctions was filed October 7, 1985 and was captioned as a motion for entry of judgment for costs and attorneys' fees.

**2.** NFO's August 30, 1985 motion to supplement its October 7, 1983 motion for costs and NFO's January 28, 1986 motion to supplement its Rule

37 submission of time have also been fully briefed on separate schedules. Both of those motions are hereby granted without further discussion in order that the record for appellate review be complete.

to agree that if current Kansas City rates are to be applied, the reasonable current Kansas City rates would be $110/hr. for partner level work, $70/hr. for associate level work, and $30/hr. for paralegal and law clerk level work. Counsel were, of course, in disagreement as to whether Kansas City or Washington, D.C. rates should apply and whether any award should be based on current or historic rates.

The September 27, 1985 report stated that counsel were unable to agree on any of the major issues posed by NFO's cost petition and the NFO and AMPI Rule 37 motions. Counsel stated, however, that "some progress" had been made on the issues presented in regard to NFO's fee claim. It is clear, however, that the only agreement reached during three days of conference was an agreement as to the current Kansas City hourly rates.

Counsel did not seek any assistance from the Court after the breakdown of those conferences. The Court, of course, did not volunteer assistance, absent such a request. If we had then been familiar with the admonition the Court added in *Blum v. Stenson*, 465 U.S. 886, 902 n. 19, 104 S.Ct. 1541, 1550 n. 19, 79 L.Ed.2d 891 (1984), to the earlier admonition of *Hensley v. Eckerhart, supra*, 461 U.S. at 437, 103 S.Ct. at 1941, to avoid a second major litigation, we might have directed counsel to engage in further negotiations. For the Court stated in *Blum* that a district "court, with its intimate knowledge of the litigation, has a responsibility to encourage agreement."

We frankly doubt whether further negotiations would have been any more successful than those already conducted pursuant to the August 9, 1985 order. For the September 27, 1985 report of those negotiations and the briefs and documents filed since the failure of the settlement conference make it clear that the parties have mutually decided, contrary to *Hensley*'s admonition, to embark on a second major litigation.[3]

Our memorandum opinion on remand, reported in 614 F.Supp. 745 (W.D.Mo.1985), shows that NFO's Rule 37 motion for monetary sanctions was presented on remand as Issue No. 2; AMPI's motion against NFO for sanctions was presented on remand as Issue No. 3; and that NFO's motion for costs was presented on remand as Issue No. 8.

The orders entered in regard to all three of those issues were consistent with this Court's acceptance of counsels' representations that they were in full agreement with the *Hensley* second major litigation admonition and that the parties, if given some guidelines, would be able to reach an agreement in regard to all three of those issues.[4]

It is now painfully obvious that the Court was overly optimistic in assuming that the parties would be able to negotiate a settlement of even the relatively uncomplicated questions presented in regard to Issues 2,

---

**3.** The parties attempt to shift the blame for the breakdown of the settlement negotiations on each other. NFO asserted, for example, in its February 19, 1986 Reply Brief filed in support of NFO's attorneys' fees petition that NFO had sought to prevent its fee petition "from turning into a second major litigation," *id.* at 40. NFO added that the defendants, by engaging in what NFO calls "guerilla warfare," are somehow responsible for the escalation of "the attorneys' fee phase into a second major litigation." *Id.* at 47. Neither of those assertions are supported by anything in the record.

AMPI has made similar charges against NFO that are lacking in support. The question, however, of who may have been responsible for the failure to reach any significant agreement at the September, 1985 settlement conferences is not relevant to any question presently before the Court.

**4.** We noted that NFO had requested that this Court only "endorse the principle that NFO is entitled to compensation for the expenditures and for the hours devoted to the Rule 37 effort" and *that the parties would thereafter* "confer in an effort to arrive at an agreed-upon figure." 614 F.Supp. at 752.

In regard to AMPI's position we noted that "AMPI, as did NFO, made appropriate recognition of this Court's letters of August 12 and August 25, 1983" (which directed attention to the Supreme Court's admonition in *Hensley* ) and that AMPI had stated that "the parties will confer in good faith about fees when and if this Court determines that compensation for particular activities is appropriate." *Id.* at 753.

3, and 8. For despite continued and frequent assertions that each side wants to avoid a second major litigation, it is crystal clear that the parties have tacitly agreed to follow exactly that course.[5]

The history of how *Alexander* has been bitterly litigated and the history of how the thirty other antitrust cases in *In re Midwest Milk Monopolization Litigation,* Multidistrict Docket No. 83, were long ago terminated establishes the sharp contrast between the inability of counsel in *Alexander* to reach agreement on even minor questions and the ability of counsel in the thirty other antitrust cases to reach complete agreement in regard to how all those cases were to be terminated.

The six opinions of the Judicial Panel on Multidistrict Litigation in *In re Midwest Milk Monopolization Litigation* [6] show that the Panel transferred 28 separate private antitrust actions to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.[7] In addition to the 28 private antitrust actions transferred pursuant to Section 1407, this Court accepted transfer pursuant to 28 U.S.C. § 1404, of the government's civil antitrust action originally filed against AMPI in the Northern District of Texas. That government case, and the government's civil action against Mid-Am, filed in this district was also processed in this Court under coordinated pretrial procedures. Both cases were long ago terminated by this Court's approval of consent decrees.[8]

The files and records of this Court and the docket sheets of the Panel establish that all of the 30 antitrust cases in which coordinated, as distinguished from consolidated, pretrial discovery was conducted, excepting only two cases transferred from the Northern District of Illinois, were disposed of by the agreement of the parties and without the conduct of any major litigation.[9]

5. As examples of second major attorneys' fees and cost litigation, *see In re Fine Paper Antitrust Litigation,* 98 F.R.D. 48 (E.D.Pa.1983), *rev'd and remanded,* 751 F.2d 562 (3d Cir.1984), and *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 776 F.2d 646 (7th Cir.1985), which reversed and remanded an attorneys' fee award "in a seemingly unending private antitrust action." The Court did state that "[w]e regret the necessity of remand requiring the expenditure of more judicial time by the trial judge in the tiresome task of trying to unravel and resolve this complex fee setting problem, and therefore urge the parties in good faith to endeavor to settle their attorneys' fees among themselves." *Id.* at 664–65.

6. *See* 379 F.Supp. 989 (Jud.Pan.Mult.Lit.1974); 379 F.Supp. 992 (Jud.Pan.Mult.Lit.1974); 386 F.Supp. 1401 (Jud.Pan.Mult.Lit.1975); 398 F.Supp. 676 (Jud.Pan.Mult.Lit.1975); 435 F.Supp. 930 (Jud.Pan.Mult.Lit.1977); and 441 F.Supp. 930 (Jud.Pan.Mult.Lit.1977).

7. Those cases were transferred from the Southern District of Texas (6 cases); from the Northern District of Illinois (8 cases); from the District of Minnesota (4 cases); from the Western District of Oklahoma (1 case); from the District of Kansas (1 case); from the Western District of Ohio (1 case); from the Eastern District of Texas (1 case); from the Western District of Pennsylvania (1 case); from the Northern District of Texas (2 cases); from the Northern District of Ohio (1 case); and from the Western District of Wisconsin (2 cases). Those cases were transferred by orders entered by the Panel in 1973 to 1977, inclusive. The only case that the panel did not transfer to this district, *Page Milk Co. v. AMPI,* No. 75 C 739, filed in the Eastern District of Wisconsin, was not transferred for the reason that at the time the Panel issued its order to show cause, this Court had been occupied in the trial of *Alexander* for over a two-year period. *See In re Midwest Milk Monopolization Litigation,* 483 F.Supp. 823 (Jud.Pan.Mult.Lit.1980).

8. *See United States v. Associated Milk Producers, Inc.,* 394 F.Supp. 29 (W.D.Mo.1975), *affirmed,* 534 F.2d 113 (8th Cir.1976), *cert. denied sub nom, NFO v. United States,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976) (the government's action was transferred pursuant to Section 1404 from the Western District of Texas), and *see United States v. Mid-Am Dairymen, Inc.,* 1977–1 Trade Cases (CCH) ¶ 61,508 (W.D.Mo.1977) (the government's action filed in this case).

9. The two Northern District of Illinois cases, *State of Illinois v. AMPI* and *Sentry Food Stores, Inc. v. AMPI,* Nos. 73 CV 78–W1 and 73 CV 80–W1, respectively, were disposed of in this Court by the granting of defendants' motions for partial summary judgment filed in both those cases. *See In re Midwest Milk Monopolization Litigation,* 529 F.Supp. 1326 (W.D.Mo. 1982), *affirmed,* 730 F.2d 528 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240 (1985). One additional case, *Ewald Bros., Inc. v. Mid-America Dairymen, Inc.,* No. 73 CV 84–W–1, transferred to this Court from the District of Minnesota, will be remanded to

The contrast between the manner in which the 28 cases on Multidistrict Docket No. 83 and the two government antitrust actions were terminated and the failure of counsels' efforts in this case to reach any agreement in regard to any significant issue requires that this Court recognize that the parties in this case would rather litigate every issue that can be litigated than settle any issue that may be subject to an additional major litigation.

It is therefore appropriate that the final judgments that will be entered in regard to the orders entered July 5, 1985 and the orders entered today will be in an agreed form that will enable the parties to present all the issues that either side may wish to seek appellate review.

We turn now to NFO's motion for clarification.

### III.

Four days before NFO filed its motion for attorneys' fees, it filed a motion captioned as a "Motion for Clarification of the Court's Ruling Denying an Award of Damages." That motion requested that this Court "clarify" its July 5, 1985 order "so as to award NFO nominal damages of One Dollar ($1.00) trebled to Three Dollars ($3.00)."

Defendants' suggestions in opposition to that motion commenced with the statement, never denied by NFO, that "NFO's reason for bringing a motion for $3.00 in damages, although unstated, is quite apparent: the prerequisite to any award of attorney's fees under 15 U.S.C. § 15 is the recovery of money damages." *Id.* at 2. We believe it obvious that at some time during the course of preparing its motion for attorneys' fees, NFO came to the realization that if this Court's July 5, 1985 decision on the damage issue was affirmed on appeal and its decision that NFO was entitled only to the minimal equitable relief awarded by this Court was reversed, NFO would find itself in the unhappy position of having no statutory basis for the award of any attorneys' fees in this case.[10]

The arguments in support of and in opposition to NFO's motion for clarification center primarily on three Eighth Circuit cases: *Rosebrough Monument Co. v. Memorial Park Cemetery Association,* 666 F.2d 1130 (8th Cir.1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982); *Morning Pioneer, Inc. v. Bismarck Tribune Co.,* 493 F.2d 383 (8th Cir.), *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *Siegfried v. Kansas City Star Co.,* 298 F.2d 1 (8th Cir.1962), *cert. denied,* 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962).

NFO argues that those three cases support its argument that "the Eighth Circuit has repeatedly *mandated* that in precisely NFO's situation ... nominal damages of one dollar trebled to three dollars should be awarded." [11] (Emphasis added). Defendants, on the other hand, argue that while "the Eighth Circuit has *approved* the award of nominal damages upon proof of injury but failure of proof as to the quantum of damages [citing the three Eighth Circuit cases]", it "has never *required* the award of nominal damages in private antitrust actions." (Emphasis added).

■ We are satisfied that the three Eighth Circuit cases to which counsel have devoted so much attention do not support NFO's argument that the Eighth Circuit has *mandated* that a district court should

---

that district in the very near future pursuant to an agreed order.

**10.** *See Paschall v. Kansas City Star Co.,* 727 F.2d 692, 704 (8th Circ. en banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 222, 83 L.Ed.2d 340 (1985), in which the Eighth Circuit en banc dissolved the injunction granted by the district court in that case and vacated the award of attorneys' fees to the plaintiff. *Paschall* will be fully discussed, *infra.*

**11.** In a footnote to the argument, NFO makes clear that its request for clarification is "made without acquiescing in the correctness of the Court's interlocutory decision of July 5, 1985 as to the adequacy of NFO's damage proof, but NFO recognizes that the only avenue open to contest that aspect of the July 5 decision is by appeal to the Eighth Circuit."

award a plaintiff nominal damages in a case in which that plaintiff has failed to carry the burden of proving any actual damages. We turn first to *Rosebrough Monument*.

## A. *Rosebrough Monument*

On the first appeal in *Rosebrough Monument*, the Court of appeals, consistent with the construction it gave Rule 52(a) of the Federal Rules of Civil Procedure prior to the Supreme Court's recent decision in *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), made a finding that the appellant's "evidence was sufficient to support the inference that appellant had in fact been injured by appellees' exclusive foundation preparation policy." 666 F.2d at 1146–47. *Rosebrough Monument*, on that first appeal also stated, without the citation of any legal authority or any explanation, that "[u]nder the circumstances, we think an award of nominal damages is justified and remand to the district court with directions to award appellant nominal damages in the amount of $3." *Id.* at 1147.

The first appeal in *Rosebrough Monument* established that the real battle in that case, in sharp contrast to the real battle in this case, was centered on plaintiff's right to injunctive relief rather than on any effort of the plaintiff to recover any substantial monetary damages. *Rosebrough Monument* concluded in regard to that issue that "the district court's denial of injunctive relief is reversed, and the portion of that cause is remanded to the district court for formulation of an appropriate order." *Id.* at 1148. The statement of the Court of Appeals that the plaintiff was entitled to nominal damages in the amount of $3.00 did not suggest that the Court of Appeals entertained any view that the plaintiff needed to be awarded $3.00 in order to have a basis for an award of attorneys' fees. For *Rosebrough Monument* was decided after 15 U.S.C. § 26 was amended in 1976 under which a substantially prevailing plaintiff was entitled to base

its request for attorneys' fees solely on Section 26 as amended in 1976.

The post-remand proceedings in the district court after the first appeal in *Rosebrough Monument*, establish that the district court on the remand, based its attorneys' fee award on the equitable relief granted. The Court of Appeals, on a second appeal, affirmed.

The district court's decision on remand is reported in 572 F.Supp. 92 (E.D.Mo.1983). That opinion shows that the district court had deferred its ruling pending the Supreme Court's decision in *Hensley*. *Id.* at 94. After concluding that *Hensley*'s standards were "applicable to the present case," the district court stated that in a case in which the prevailing party "has achieved only partial success," *Hensley* required that it "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." (Quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940).[12]

The district court stated that, on the facts, there "is no question that the injunctive relief sought was a substantial objective and that the relief obtained was virtually complete." *Id.* at 95. It then stated that by "contrast, plaintiff recovered insignificant damages, through trial and appeal, after expending enormous efforts to prove its claim of well over three million dollars." *Id.* at 95.

The plaintiff in *Rosebrough Monument*, as does NFO in this case, argued that a "*full assessment* of attorney's fees is appropriate because it prevailed on all counts, notwithstanding that only One Dollar ($1.00) was awarded and then trebled for a total recovery of Three Dollars ($3.00)." (Emphasis added). The plaintiff, as does NFO, argued that "the injunctive relief awarded, *combined with the nominal damages*, constituted substantial success and justifies a *full award* of fees." (Emphasis added.) *Id.* at 95.

---

**12.** The district court appropriately added, without specific quotation from the case, that the *Hensley* "Court emphasized repeatedly that the

degree of success obtained is the critical factor." *Id.* at 95.

The district court expressly rejected plaintiff's argument. It concluded that the "mere fact that plaintiff obtained judgment on one or more counts does not necessarily establish the 'degree of success' but rather goes to determining whether plaintiff was a prevailing party, and hence entitled to fees at all." [13] *Id.* at 95. The district court concluded that *Hensley* required that "in evaluating the appropriate *amount* of fees, the Court looks more broadly to the 'significance of the overall relief' " (emphasis, the court) and that "must necessarily include a consideration of the amount of damages recovered compared to the amount sought, as well as all other relief (including injunctive relief) that collectively measures the fruits of plaintiff's efforts." *Id.* at 95. The district court accordingly determined that it would award as attorneys' fees "that amount which is reasonable in relation to plaintiff's success on the issue of injunctive relief, and *its failure* on the issue of damages." (Emphasis added). *Id.* at 95. As stated by the Court of Appeals on the second appeal in *Rosebrough Monument,* the district court reduced "its attorney's fees award to one-half of the amount requested because appellant failed to obtain monetary relief except for $3.00 in nominal damages." 736 F.2d at 446.

The second appeal in *Rosebrough Monument* is reported in 736 F.2d 441 (8th Cir. 1984). The Court of Appeals concluded on second appeal that in "the present case the district court, which presided over the litigation, was in the best position to evaluate the time and resources expended on appellant's unsuccessful attempt to prove its measure of damages" and that "[w]e find no error or abuse of discretion in the district court's reduction of the attorney's fee award by one-half to account for appellant's *failure to obtain any significant*

*money damages.*" *Id.* at 446. (Emphasis added). Accordingly, the Court of Appeals affirmed the district court's reduced award of attorneys' fees.

*Rosebrough Monument* is distinguishable on its facts from this case. In *Rosebrough Monument,* the district court found as a fact, that the equitable relief obtained by the plaintiff in that case was "virtually complete." 572 F.Supp. at 95. The record in this case does not even come close to supporting such a finding.[14] The district court in *Rosebrough Monument* did not find that the plaintiff was entitled to any attorneys' fees on the ground the Court of Appeals had concluded that the plaintiff was entitled to nominal $3.00 damages.

Nor did it need to do so. For after the Congress amended 15 U.S.C. § 26 in 1976, the question of whether nominal damages would support an attorneys' fee award under 15 U.S.C. § 15 became largely academic in all cases in which a plaintiff established a right to substantial equitable relief. We cannot believe that the Court of Appeals would have affirmed the district court's decision to base the plaintiff's attorneys' fee award solely on the equitable relief obtained by plaintiff if the Court of Appeals entertained any notion that an award of $1.00 damages, trebled to $3.00, could be said to mandate an award of at least some attorneys' fees on a plaintiff's damage claim. In short, we do not believe *Rosebrough Monument* may properly be said to support NFO's clarification motion.

### B. *Morning Pioneer*

Both *Morning Pioneer* and *Siegfried* were decided before Section 26 was amended in 1976; hence a plaintiff could establish a right to attorneys' fees only if it could establish that it was the prevailing party in

---

**13.** The district court appropriately noted that portion of *Hensley* which stated that "the plaintiff is a 'prevailing party' therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved." *Id.* at 95.

**14.** Indeed, the only equitable relief awarded plaintiff in this case was awarded solely as a result of this Court's determination that it was

under duty to follow the Court of Appeals finding and conclusion that "NFO is plainly entitled to an injunction against the kind of unlawful conduct identified here." *Alexander v. National Farmers Organization,* 687 F.2d at 1210. The Court of Appeals, of course, will undoubtedly have another opportunity to consider whether this Court properly followed what it considered was its express direction that "NFO is plainly entitled to an injunction" in this case.

the antitrust case within the meaning of Section 15. *Morning Pioneer* affirmed the decision of the district court reported in 342 F.Supp. 1135 (N.D.1972). The district court, in a case tried without a jury, concluded that plaintiff's proof in regard to the extent of its damage was "almost nonexistent." *Id.* at 1143. Without the citation of any authority, the district court concluded that "I hold that there has been no proof of loss with sufficient particularity to allow the calculation of damages, and I award the Plaintiff the sum of one dollar, his costs and reasonable attorney fees." *Id.* at 1143. Plaintiff's prayer for an injunction was also denied.

The Court of Appeals noted at the outset of its opinion affirming the district court that it had "denied injunctive relief but awarded the Pioneer nominal single damages of one dollar (three dollars trebled) and attorney's fees of $7,350, plus costs for the Sherman Act violation." 493 F.2d at 385. In regard to the attorneys' fee issue argued on appeal, the Court of Appeals concluded only that it could not find that the district court had abused its discretion in awarding an attorneys' fee of $7,350. It stated that when "the damages recovered are relatively small, as is the case here, it is not necessarily an abuse of discretion to grant attorneys' fees in excess of the damage award."[15] *Id.* at 390.

*Morning Pioneer*, in our judgment, does not support NFO's argument in support of its motion for clarification.

## C. *Siegfried*

Neither the opinion of the district court nor that of the Court of Appeals in *Sieg-fried* state the procedural history under which the district court entered its judgment for nominal damages set forth in *Siegfried v. Kansas City Star Company*, 193 F.Supp. 427, 439–440 (W.D.Mo.1961). That history, however, shows that plaintiffs in *Siegfried* actually opposed the entry of a judgment for nominal damages in their favor and that such a judgment was entered at the suggestion of the defendants in that case. The question of whether the judgment for nominal damages was properly entered was never litigated on appeal. Plaintiffs argued on appeal, as they did in the district court, that *no* judgment, including the judgment for nominal damages, should have been entered. Plaintiffs consistently argued in both the district court and in the Court of Appeals that they were entitled to a new trial.

The district court files and records in *Siegfried* show that on December 16, 1960, eight days after the jury returned its special verdicts,[16] the late Judge Ridge entered an order which directed counsel for the parties to file suggestions in regard "to what form of judgment, if any, ... should be entered by the Court." Defendants' response to that order included a motion to enter judgment in the form attached to its motion.

Defendants' December 21, 1960 suggestions in support of that motion stated that it "is the contention of the defendants that plaintiffs are entitled to an award of nominal damages only in the amount of one dollar or less per count which, of course, would be trebled by the Court pursuant to Section 4 of the Clayton Act. *Id.* at 1.[17]

---

**15.** The *Morning Pioneer* corporation cited *Advance Business Systems & Supply Co. v. SCM Corporation,* 415 F.2d 55, 70 (4th Cir.), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), to support the statement quoted in the text. In that Fourth Circuit case the "plaintiff requested fees of $60,000, and the court awarded $35,875, subtracting that portion of the fees attributable to time spent in developing issues and items on which the plaintiff failed to prevail."

**16.** The special verdicts are set forth as a part of the March 1, 1961 judgment and appear in 193 F.Supp. at 439.

**17.** On January 9, 1961, the defendants filed a response in opposition to plaintiffs' motion for new trial that had been filed by plaintiffs on December 21, 1960. Defendants' response made clear that "defendants are not claiming that they are entitled to judgment, but they do contend that plaintiffs are entitled to no more than nominal damages." *Id.* at 34.

It is of incidental interest to note that Colvin A. Peterson, who has served as active local counsel for AMPI throughout the litigation of this case, was one of the attorneys for the defendants in *Siegfried.*

There can be no question that counsel for the plaintiffs in *Siegfried* opposed the entry of a judgment for nominal damages in plaintiffs' favor. One response filed on behalf of all plaintiffs argued that the district court could not enter any judgment on the special verdict rendered by the jury. A second response filed on behalf of three plaintiffs represented by Harry P. Thomson, who has served as lead counsel for Mid-Am throughout the pretrial proceedings and the trial of this case, agreed with counsel for the other plaintiffs that the district court could not enter any judgment. Mr. Thomson conceded, however, that *Finley v. Music Corporation of America,* 66 F.Supp. 569 (S.D.Cal.1946), might be said to support the entry of a judgment for nominal damages. But he was quick to point out that "the Finley case has never been subsequently cited and the writer questions its authority on the issue of damages."[18]

On March 1, 1961 Judge Ridge entered an order directing that the Clerk enter judgment in the form as submitted in Exhibit A attached to defendants' motion for judgment. Plaintiffs filed a notice of appeal on March 29, 1961. The Court of Appeals affirmed in 298 F.2d 1 (8th Cir. 1962). Certiorari was denied on March 19, 1962. 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962). It is clear that the question of whether nominal damages should be awarded in a case in which the plaintiff failed to prove any actual damage was not presented on appeal in *Siegfried.* The defendants were defending the judgment entered at their request. The plaintiffs were arguing that plaintiffs were entitled to a new trial and that the district court had erred in entering a judgment in any amount.

In support of its argument that this Court is under some sort of a mandate to award NFO $3.00 in treble damages, NFO stated on page 6 of its suggestions in support of its motion for clarification that the Court of Appeals in *Siegfried* "applauded the lower court's instructions to the jury because [those instructions] explained that if the fact of antitrust damage is shown, but the amount is in question, then the plaintiff should recover nominal damages." We conclude that NFO's argument is based on a totally inaccurate reading of the Court of Appeals' opinion.

Judge Ridge's view that a jury could return a verdict for nominal damages in an antitrust case was first stated in Judge Ridge's original charge to the jury, which plaintiffs never attacked. That view was repeated in his supplemental charge to the jury. Plaintiffs never challenged the inclusion of the nominal damage instruction in Judge Ridge's supplemental charge. Plaintiffs, both in the district court and in the Court of Appeals, argued that the district court erred when it gave its supplemental charge and when it entered entry of *any* judgment on the special verdicts rendered after that supplemental charge was given the jury.

It is thus clear that the Court of Appeals did not, as NFO argues, "applaud" Judge Ridge's charge on nominal damages. The Court of Appeals had no occasion to and did not, in fact, even comment on that charge. It simply stated that it "considered the trial courts' summary of the evidence to be fair and complete" and that

---

**18.** Although delayed, Mr. Thomson's view in regard to questionable validity of *Finley* was confirmed in *Byram Concretanks, Inc. v. Warren Concrete Prod. Co. of N.J.,* 374 F.2d 649 (3d Cir.1967). In that case the Third Circuit made reference to the "long line of cases the courts have interpreted this section of the Clayton Act [15 U.S.C. § 15] not to permit plaintiffs to recover attorneys' fees, unless treble damages are awarded, regardless of whether injunctive relief is granted." *Id.* at 651. After citing numerous cases to support that statement, *Finley* was given

a "but compare" citation to indicate that it was out of line with the cases cited.

This Court cited and applied the rationale of *Byram Concretanks* in *Adams Dairy Co. v. National Dairy Products Corp.,* 293 F.Supp. 1168, 1169 (W.D.Mo.1968). *Byram Concretanks* was most recently cited and quoted with approval in *Aetna Cas. and Sur. Co. v. Liebowitz* 730 F.2d 905, 908 (2d Cir.1984). We have not changed our view that *Byram Concretanks* was correctly decided.

it adopted "the trial court's summary of the evidence as our own." 298 F.2d at 5.[19]

It is thus apparent that NFO's attempt to rely on the Court of Appeals' opinion in *Siegfried* as a mandate that this Court should "clarify" its opinion by an award of $1.00 nominal damages is untenable.

### D. *McCleneghan v. Union Stock Yards of Omaha*

We believe that it should be added that the Court of Appeals has implicitly indicated that it would not be inclined to adopt a rule that a plaintiff who fails to prove actual damages in an antitrust case may nevertheless be entitled to an award of nominal damages, should such a question be directly presented on some future appeal. For the Court of Appeals has cited Judge Friendly's opinion in *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962), with approval.

*Schwabe*'s footnote 4 cited the district court opinion in *Siegfried* as an example of a small number of certain cases that "have awarded or indicated the possibility of awarding nominal damages under § 4 of the Clayton Act." 297 F.2d 906, 909.

Judge Friendly added, however, that "this seems dubious in the light of the language of the statute and the Supreme Court opinions." *Id.* at 909.[20]

The Eighth Circuit had occasion to consider *Schwabe* and Judge Friendly's conclusion that the district court's opinion in *Siegfried* was "dubious" in *McCleneghan v. Union Stock Yards of Omaha*, 349 F.2d 53 (8th Cir.1965).

In affirming the district court's grant of a directed verdict, the *McCleneghan* court quoted from *Schwabe* and from the cases from other circuits cited in *Schwabe*'s footnote 4 upon which Judge Friendly relied to support his conclusion that the district court opinion in *Siegfried* was "dubious" to support its conclusion that "the trial court correctly determined that plaintiff has failed to establish the fact that he suffered any damage which was caused by defendants' alleged wrongful acts." 349 F.2d at 59.[21]

We are thus satisfied that the Eighth Circuit's decision in *McCleneghan*, the Eighth Circuit decisions cited in that case, and the Eighth Circuit decisions that have followed *McCleneghan* are consistent with

**19.** Rather than applauding Judge Ridge's "views of the law", the Court of Appeals outlined the objections made by the plaintiffs on appeal in regard to the instructions in Part III of its opinion, *see* 298 F.2d at 6–8, none of which so much as mentioned the nominal damages portion of the district court's instructions, and simply concluded that "instructions upon the damage issue *when considered as a whole* fairly state the law relating to damages." *Id.* at 8. (Emphasis added).

**20.** Judge Friendly concluded in *Schwabe* that the Supreme Court's opinions in *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), and *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), had not in any way "detracted from Mr. Justice Brandeis' statement in Keogh [*Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183 (1922) ] or held that mere proof that a defendant has injured its competitors generally warrants recovery in the absence of evidence that would justify a finding of injury to the particular plaintiff and would supply a ra-

tional basis for approximating its amount. To the contrary, 'the jury may not render a verdict based on speculation or guesswork,' *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. at 264, 66 S.Ct. at 579." 297 F.2d at 909–910.

The Court was recently asked to overrule portions of *Keogh*. It refused to do so in *Square D. Co. v. Niagara Frontier Tariff Bur.*, —— U.S. ——, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

**21.** *McCleneghan* stated that its decision in that case was supported by *Duff v. Kansas City Star Co.*, 299 F.2d 320 (8th Cir.1962); *Jack v. Armour & Co.*, 291 F. 741 (8th Cir.1923); *National Wrestling Alliance v. Myers*, 325 F.2d 768 (8th Cir. 1963); and *Siegfried v. Kansas City Star Co.*, 298 F.2d 1 (8th Cir.1962).

*McCleneghan*, has been cited with approval in the following Eighth Circuit cases: *Paschall v. Kansas City Star Co.*, 605 F.2d 403, 409 (8th Cir.1979); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 893 (8th Cir.1978); *Ag-Chem Equipment Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 493 (8th Cir.1973); *Airline Pilots' Assn. International v. Northwest Airlines, Inc.*, 415 F.2d 493, 498 (8th Cir.1969); *Dean Foods v. Albrecht Dairy Co.*, 396 F.2d 652, 658 (8th Cir. 1968).

our view that NFO's argument is untenable. Accordingly, an order will be entered denying NFO's motion for clarification.

We turn now to NFO's motion for attorneys' fees and its separate motion for costs.

### IV.

### A.

■ Although NFO has not been awarded any damages, its motion for attorneys' fees was based on both 15 U.S.C. §§ 15 and 26. That motion will be denied without prejudice for reasons we shall state in detail. For any award of attorneys' fees that this Court might make at the present time would necessarily be based on this Court's view of extent of NFO's success in this litigation, a view which may or may not be sustained on appellate review of the merits of this case. The same analysis is applicable to NFO's motion for costs and reasonable litigation expenses for the reason that it may or may not eventually be determined on final appeal that NFO will be the prevailing party in this litigation. NFO's motion for costs will accordingly also be denied without prejudice.

The parties' arguments are poles apart. NFO argues on page 3 of its Main Fee Brief that *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and other cited cases establish that there is "no basis for a fee reduction attributable to 'unsuccessful claims' or 'lack of success.'"[22] Defendants, on the other hand, argue on page 5 of their Main Opposition Brief that NFO's failure to prove any actual damage and its failure to obtain any significant equitable relief mandates the complete denial of NFO's attorneys' fee petition.

It is thus clear that focus must be directed on the sharp dispute that exists in regard to whether the extent of NFO's success is a factor that this Court would be required to consider in determining the proper amount of any attorneys' fee that might be awarded. For NFO basicly contends that its success is not a relevant factor that need be considered and that defendants, with equal vigor, contend that NFO's present lack of success is the crucial factor that mandates a total denial of any attorneys' fee award to NFO.[23]

■ We are satisfied that the extent of a plaintiff's ultimate success on the merits is a crucial factor that must be considered in determining the amount of attorneys' fees to be awarded and that NFO's arguments to the contrary are untenable. NFO's purported reliance on and selective quotation of portions of *Hensley* requires that we detail the manner in which we believe that case must be read.

### B.

The point of beginning is that appropriate recognition must be given to the fact that *Hensley* presented the precise issue of "whether a partially prevailing plaintiff may recover an attorney's fee for legal

---

**22.** NFO submitted a proposed order for an $18,-280,668.50 award of attorneys' fees. That award is based on 75,379.64 partner hours, 44,-401.99 associate hours, and 33,672.93 law clerk and paralegal hours. NFO concedes that it deleted only 721 hours for what it considered to be non-*Alexander* time and some other unidentified "NFO-General" and "NFO–SEC" time that had been billed.

NFO makes clear that "NFO is entitled to an attorney's fee award under the Clayton Act for all its *Alexander*-related efforts, with no subtraction based on the fact that these efforts also related to Phases I and III." NFO Main Fee Brief at 10. NFO, however, does not cite any statutory or other legal authority to support is argument that a defendant who is the prevailing

party in an antitrust action is entitled to an attorneys' fee award.

**23.** We recognize that NFO, on page 3 of its February 19, 1986 Reply Brief gave lip service to the proposition that the *"Hensley* decision recognizes that the plaintiff's degree of success is a significant factor." NFO's real view, however, as stated in full in its "degree of success" argument made on pages 1 to 3 of its Reply Brief, makes clear that NFO's apparent concession was only a token one. For NFO concluded its "degree of success" argument with the statement that "[i]n short, NFO has prevailed on its main claim and no significant subtraction from its fee application is appropriate here." NFO's Reply Brief at 3.

services on unsuccessful claims." 461 U.S. at 426, 103 S.Ct. at 1935–36. The defendants "opposed the request on numerous grounds, including inclusion of hours spent in pursuit of unsuccessful claims." *Id.* at 428, 103 S.Ct. at 1937. The Court noted that the district court "refused to eliminate from the award hours spent on unsuccessful claims" when it awarded plaintiff an attorneys' "fee of $133,332.25." *Id.* at 428, 103 S.Ct. at 1937. The Court vacated the district court's award and remanded the case for further proceedings to be conducted in accordance with the standards stated in the *Hensley* opinion.

In stating the standards to be applied to the facts of a particular case, the Court noted that Congress had cited the Fifth Circuit opinion in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), with approval. The Court noted that "[o]ne of the factors in *Johnson,* 'the amount involved and the results obtained,' indicates that the level of a plaintiff's success is relevant to the amount of fees to be awarded." *Id.* at 430, 103 S.Ct. at 1938. The Court stated that the "results obtained" factor "is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of

his claims for relief." *Id.* at 434, 103 S.Ct. at 1940.[24]

The Court concluded that it was necessary to remand the case to the district court "because the District Court's opinion did not properly consider the relationship between the extent of success and the amount of the fee award." *Id.* at 438, 103 S.Ct. at 1942.[25] The district court was directed to determine the proper amount of attorneys' fees in accordance with the standards stated in *Hensley.*[26]

The attorney's fee cases decided by the Supreme Court after *Hensley* have not in any way modified that case. *See Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Webb v. Dyer County Board of Education,* —— U.S. ——, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985); and *Evans v. Jeff D.,* —— U.S. ——, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986).

We recognize, of course, that the Supreme Court granted certiorari for the second time in *City of Riverside v. Rivera,* —— U.S. ——, 106 S.Ct. 244, 88 L.Ed.2d 253; that it heard argument in that case on March 31, 1986 (54 L.W. 3678); and that the decision in that case may be handed down before the Court's summer recess (54 U.S.L.W. 3741).[27]

---

**24.** Later in its *Hensley* opinion the Court stated that "[w]e emphasize that the inquiry does not end with a finding that the plaintiff obtained significant relief" *id.* (461 U.S. at 439–40, 103 S.Ct. at 1943) and that a "reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* at 440, 103 S.Ct. at 1943.

**25.** *Hensley* further concluded that the district court's reliance on the Eighth Circuit's opinion in *Brown v. Bathke,* 588 F.2d 634 (8th Cir.1978), was misplaced for the reason that the Court believed that *Brown* understated "the significance of the results obtained." *Id.* 461 U.S. at 438–39, 103 S.Ct. at 1942. *Hensley* expressly disapproved what it considered was *Brown*'s conclusion that the results obtained factor should not "be given such weight that it reduces the fee awarded to a prevailing party below the 'reasonable attorney's fee' authorized by the Act.' *Id.* [588 F.2d] at 637." The Court stated that the Eighth Circuit in *Brown* had "implied that the District Court should not withhold fees for work on unsuccessful claims unless those claims were frivolous" and stated that: "Today

we hold otherwise." 461 U.S. at 439, 103 S.Ct. at 1942.

**26.** The files and records of this Court do not show the amount of attorneys' fees eventually paid the plaintiff in *Hensley.* Those records do show that on December 6, 1983, Judge Hunter entered an order which stated: "Based on the Stipulation of Dismissal filed by the parties, the Court hereby dismisses with prejudice all claims remaining in the above styled action." That stipulation simply stated the parties had entered into a Settlement Agreement which had resolved "any and all claims amongst the parties" and that the parties agreed that all their claims be dismissed with prejudice. Judge Hunter has advised me that he does not recall that he ever learned of the actual terms of the settlement; he stated that he was happy that the parties had settled the amount of attorneys' fees to be paid plaintiffs in accordance with *Hensley*'s admonition against a second major litigation.

**27.** The pending certiorari petition is directed to the Ninth Circuit's decision in 763 F.2d 1580. That decision was rendered after the Ninth Cir-

One Justice, however, has already indicated that the probability that the Ninth Circuit will again be reversed is substantial, see Justice Rehnquist's grant of stay in —— U.S. ——, 106 S.Ct. 5, 87 L.Ed.2d 683. In light of the grounds stated in support of that grant of stay, with which we agree, we see no reason to defer our decision until *City of Riverside* is decided. We do not anticipate the Court is about to overrule *Hensley* and the progeny of that case cited above.

### C.

*Williams v. Mensey,* 785 F.2d 631 (8th Cir.1986), decided on March 7, 1986, reflects the Eighth Circuit's most recent application of the standards articulated in *Hensley.* That case involved a Section 1983 action against St. Louis County and nine individuals who were either officials or correctional officers of the St. Louis County Jail. Judgments were entered by the district court on jury verdicts for all defendants except Armstrong, one of the correctional officers. The jury, however, awarded only $1.00 damages in favor of the plaintiff against Armstrong. The district court originally denied plaintiff's request for any attorneys' fees on the ground that the plaintiff had obtained only "limited success" in the litigation. *Id.* at 634.

The Court of Appeals summarily reversed the district court's total denial of any attorneys' fees awards and remanded the case to the district court by a February 23, 1984 order of the Court of Appeals. On

remand, the district court granted an attorney fees award in the amount of $1,000.

After hearing oral argument on April 11, 1985, the Court of Appeals entered still another order on May 10, 1985 that again remanded the case to the district court. In that order the district court was requested, in accordance with *Hensley,* "to provide a concise but clear explanation of its reasons for the fee award." *Id.* at 639 n. 2. On the second remand, the district court stated the reasons for its original award and "reaffirmed its position that Williams was entitled to attorney fees in the amount of only $1,000 rather than the $10,493.63 requested." *Id.* at 639–40.[28]

The Court of Appeals affirmed the district court's award of attorneys' fees of only ten percent of the attorneys' fees requested. It concluded that "the district court did not abuse its discretion in determining that a $1,000 fee award was reasonable." In affirming, the *Williams v. Mensey* court relied on that portion of *Hensley* (461 U.S. at 440 [103 S.Ct. at 1943]) which stated, that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Id.* at 640.

■ We thus conclude that under the standards of *Hensley* and *Williams v. Mensey,* a district court is under duty to award attorneys' fees in an amount that is reasonable in relation to the results obtained. The difficulty presented in this case that will not go away is the fact that neither this Court nor anyone else can pres-

cuit's first decision in 676 F.2d 1240 was vacated on the Court's first grant of certiorari and after the case was remanded to the Ninth Circuit for further consideration in light of *Hensley. See* 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983). The district court, on remand, awarded exactly the same amount of attorneys' fees that it had previously awarded. On a second appeal the Ninth Circuit again affirmed, holding that it "could not find any support for the 'proposition that there need be a relationship between the amount of damages awarded to the prevailing party and the amount of attorney's fees awarded.'"

**28.** The Court of Appeals stated that the district "court explained that Williams had 'prepared

for trial with respect to two separate causes of action [counts 1 and 3] against each of the nine defendants' and that '[t]he records of the work done as set out in the time sheets of [Williams'] attorney reveal substantial amounts of work done in preparation for trial against * * * defendants who [either] received a defendants' verdict as to both counts * * * [or were] directed out at the close of [Williams'] case.' *Williams v. Mensey,* No. 81–1379C(5), slip op. at 5 (E.D.Mo. Oct. 7, 1985) (order on remand). The court also observed that on the one claim which Williams did prevail, the jury awarded damages of only $1.00." *Id.* at 640.

ently predict what result NFO may eventually obtain in this case. The judgments that will be entered in this Court are subject to, and undoubtedly will be subjected to further appellate review.

An appellate court, either the Court of Appeals or the Supreme Court, may affirm or reverse either or both of the judgments that will be entered that will reflect our decisions that (1) NFO failed to carry the burden of proof on its claim for damages and that (2) NFO is entitled only to the limited equitable relief awarded by this Court pursuant to its understanding of the directions given it by the Court of Appeals. The result that matters simply will not be finally determined until the parties will have exhausted all their available rights to appellate review.[29]

If this Court is eventually reversed on both issues, the result that matters cannot be determined until further procedures on the merits will have been conducted in this Court on remand. Further appellate proceedings on the merits, of course, would thereafter be required before the result that matters would be finally determined. Should this Court be reversed on the damage issue but affirmed on the equitable relief issue, the same procedures on remand would be required before the result that matters would be finally determined. And if this Court is affirmed on the damage issue, but reversed on the equitable relief issue by a final appellate decision, NFO's entitlement to any attorneys' fee award, might well be placed in jeopardy.

In short, any attorneys' fee award that this Court may make at this time, would necessarily have to be based on the results that NFO has up to this point obtained in the district court. Any award of attorneys' fees that would be based on judgments that are subject to immediate appellate re-

view would be nothing more than an exercise in futility unless it is assumed that this Court will eventually be affirmed on the judgments that will be entered on both the damage issue and equitable relief issue. Based on its experience with the parties, the Court is confident that the parties will not be in agreement that such an assumption should be made. We are accordingly satisfied that the extent of NFO's success or lack of success should be finally determined on appeal before this Court embarks on what promises to be a second major litigation in connection with NFO's request for an attorneys' fee award.

The ultimate appellate disposition of two cases, one in the Eighth Circuit and one in the Supreme Court, illustrate the fact that district court awards of attorneys' fees and awards of costs that are made before final appellate determination of the merits of an antitrust action simply may be here today and gone tomorrow. Those cases underline the futility of engaging in a second major litigation before the merits of the first major litigation are finally determined on appeal. We turn now to those two cases.

### D.

The panel opinion in *Paschall v. Kansas City Star Co.*, 695 F.2d 322 (8th Cir.1982), affirmed the district court's judgment that the plaintiff was entitled to injunctive relief for defendant's violation of Section 2 of the Sherman Act. That panel opinion shows that the district court awarded the plaintiff approximately $2.5 million in attorneys' fees. The Court of Appeals reduced that attorneys' fee award to $1,231,485.61.[30] The district court also awarded the plaintiff $342,339.42 in costs: $34,407.14 in stipulated items and $307,932.28 for expert witness fees. The cost award was affirmed in its entirety.[31] The panel opinion in *Pasc-*

---

**29.** The "result that matters" language in the sentence footnoted is an obvious paraphrase of *Hensley*'s statement that "The result is what matters." 461 U.S. at 434, 103 S.Ct. at 1940.

**30.** The Court of Appeals vacated the portions of the district court's award which reflected a $1,102,091.24 bonus and a $166,443.15 premium

which the district court included in its attorneys' fee award.

**31.** Senior Judge Henley, dissenting, stated that he would "reverse the district court's finding of an antitrust violation and refuse to award costs or attorney fees." 695 F.2d at 343. He added in a footnote that in any event he would adhere to

*hall* was overruled by the Court en banc in *Paschall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir. en banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984). The majority Court en banc opinion stated that "we reverse the judgment of the district court, dissolve the permanent injunction and vacate the award of attorney fees." 727 F.2d at 704.

Judge Sachs'[32] concurring opinion in *Hiegel v. Hill,* 771 F.2d 358 (8th Cir.1985), the Eighth Circuit's latest opinion dealing with costs, shows that the mandate in *Paschall II* reached the district court between the time *Hiegel v. Hill* was argued on March 11, 1985 and the time that case was decided on August 9, 1985. Judge Sachs' concurring opinion further shows that plaintiff's $312,932.28 cost award was vacated along with plaintiff's $1,231,485.61 attorneys' fee award. On remand, the defendant, rather than plaintiff was awarded costs in the amount $41,194.89.[33]

It is thus apparent that the Court en banc's reversal of the district court judgment in *Paschall II* and the Supreme Court's ultimate denial of certiorari, not only resulted in plaintiff's loss of his attor-

ney's fee award of $1,231,485.61 and his over $300,000 costs award; it also resulted in plaintiff's obligation to pay the defendant over $42,000 in costs.[34]

A reversal by the Supreme Court of a district court antitrust judgment in favor of a plaintiff has the same impact on a district court's award of attorneys' fees and costs as a Court of Appeals reversal of plaintiff's judgment. In *Independence Tube Corp. v. Copperweld Corp.*, 543 F.Supp. 706 (N.D. Ill.1982), the plaintiff recovered a $7,497,-027.00 antitrust judgment. Plaintiff also recovered a judgment against one of the two defendants on a state tort law claim. The district court awarded plaintiff attorneys' fees of $1,722,175.53 and costs of $92,497.17 on plaintiff's Sherman Act recovery. The Seventh Circuit affirmed all the judgments entered by the district court "in their entirety." 691 F.2d 310, 331 (7th Cir.1982).

The Supreme Court, however, granted certiorari and in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), reversed the Sherman Act judgment of the Court of Appeals outright.[35] Thereafter the Sev-

the traditional American view and "disallow expert witness fees over and above the statutory allowances provided in 28 U.S.C. § 1821." *Id.* at 343.

**32.** The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting with the Court of Appeals by designation.

**33.** The files and records of the district court establish that on June 26, 1985, the defendant presented a proposed bill of costs in the amount of $49,920.06. As Judge Sachs noted in his concurring opinion in *Hiegel v. Hill,* the defendant did not seek to recover any costs for expert witness fees. The record in this Court further shows that the parties arrived at the stipulated costs figure of $41,194.89 on July 3, 1985 and the order taxing those costs against the plaintiff was entered July 7, 1985.

**34.** *Hiegel v. Hill* is of incidental interest in the long term view of this case. For that case reversed the district court's award of costs and remanded for a new determination of costs because of the district court's failure to carefully scrutinize the prevailing party's bill of costs. The Court of Appeals was particularly con-

cerned about the district court's allowance of "costs expenditures for expert witnesses in excess of the statutory allowances of 28 U.S.C. § 1821" and stated that we "also are troubled by the District Court's summary treatment of defendants' claims for attorney's travel and subsistence expenses." 771 F.2d at 360.

Judge Sachs, we believe accurately, observed in his concurring opinion in that case that although the panel opinion in *Paschall I* "endorses a trend toward more frequent allowance of expert witness fees as costs ... the decision here and others cited by the court suggest there may be some reversal in the trend, and some movement toward Judge Henley's dissenting position on costs in *Paschall [I]*." *Id.* at 361. Judge Henley's dissent in *Paschall I* is summarized in footnote 31 above. Like Judge Sachs, we find it unnecessary to deal with either *Paschall I* or *Paschall II* for the reason NFO's motion for costs will be denied without prejudice.

**35.** The Court's decision was handed down on June 19, 1984. On July 19, 1984 the plaintiff filed an alternative motion in the Supreme Court (1) to enter an order providing for non retroactive application of judgment, or (2) to enter an order remanding the case for further

enth Circuit, on remand from the Supreme Court, in an unpublished order entered December 12, 1984, copy of which we obtained from the Northern District of Illinois, remanded the case to the district court with instructions to enter judgment for the defendants on Independence's Sherman Act claim and to enter judgment for the defendants for $15,758.55 for its costs incurred by them in prevailing in the Supreme Court.[36]

It is thus clear that the Supreme Court's reversal of the district court's judgment on the merits of the plaintiff's antitrust claim in *Independence Tube Corp. v. Copperweld Corp.* had the same impact on the plaintiff's awards for attorneys' fees and costs that the Court of Appeals' reversal of the district court had in *Paschall II.* In both instances, the plaintiff lost their attorneys' fee awards and their awards for costs incurred in prosecuting their respective antitrust claims.

For the reasons stated, orders will be entered denying without prejudice (1) NFO's motion for attorneys' fees pursuant to 15 U.S.C. §§ 15 and 26 and (2) NFO's motion for costs and reasonable litigation expenses.[37]

### V.

### A.

It is appropriate that NFO's Rule 37 motion and AMPI's motion for sanctions be discussed together. For both motions require this Court to determine the amount of sanctions that should be imposed against those two parties. While it may be difficult to understand why the concealment and destruction of documents by one party should be viewed in any different light than the destruction by another party, we believe that what the Court of Appeals said in regard to AMPI's destruction must be considered as an implicit direction that this Court should impose a greater sanction on AMPI than the sanction it should impose on NFO. It is thus clear, assuming that we have correctly read the Court of Appeals' decision, that any sanction imposed against NFO will do no more than reduce the amount of any sanction that may be imposed against AMPI.

Our discussion of both motions must necessarily include a discussion of other proceedings that were being conducted in regard to other matters that pended before this Court during the same period of time that proceedings were being conducted in regard to the motions for sanctions. Those separate proceedings related to (1) NFO's efforts to block this Court's approval of the consent decree in the government's action against AMPI; (2) AMPI's efforts to obtain an order in the Western District of Texas for the return of the material adduced in evidence before the San Antonio Grand

---

proceedings. That motion, a copy of which we obtained from the Clerk of the Supreme Court, argued that the "Court's new rule, if it were to be retroactively applied, would severely penalize this antitrust plaintiff, who proceeded in good faith on the basis of this Court's prior decisions." Motion at 5. Plaintiff's motion recognized that unless the Court granted the motion, plaintiff would lose the Sherman Act attorneys' fees and costs awarded by the district court. Plaintiff argued that to "now deny respondent reasonable compensation for its injury by retroactive application of an unanticipated reversal of long-standing law would reward petitioners, who flaunted that law and damaged competition through intentional anticompetitive acts." Motion at 6. The Court summarily denied that motion on October 29, 1984. *See* — U.S. —, 105 S.Ct. 319, 83 L.Ed.2d 257 (case 2).

**36.** The district court was also instructed to enter judgment for the plaintiff for costs only in an amount to be determined by the district court for prevailing on its state tort law claim which was undisturbed by the Supreme Court's decision. We have been advised that all parties conceded on remand that the Sherman Act attorneys' fee award and the award for costs for prosecuting plaintiff's antitrust claim were wiped out by the Supreme Court's reversal.

**37.** Our action denying NFO's motion for costs without prejudice is, of course, consistent with our Memorandum and Order entered August 12, 1981 which denied CMPC's earlier motion for entry of judgment for costs without prejudice. CMPC filed that motion on July 6, 1981 at a time when, before appeal, it was a prevailing party in this litigation. Consistent with our ruling today, we stated in our August 12, 1981 memorandum denying CMPC's motion that "all questions relating to costs should be deferred at least until after the pending appeals are determined by the Court of Appeals."

Jury proceeding; (3) NFO's resistance of AMPI's efforts in that district, in the Fifth Circuit, and in the Supreme Court; (4) NFO's Rule 6(e) motions filed in this Court to obtain disclosure of the San Antonio Grand Jury material eventually transferred to this district; and (5) AMPI's more than vigorous resistance of NFO's second Rule 6(e) motion for disclosure of the grand jury material. For the battles NFO and AMPI waged in regard to those separate matters had a direct impact on this Court's ability to rule NFO's Rule 37 motion and to its ability to get NFO to rest its case-in-chief during the trial of Phase II of this case.

Those matters must be discussed and placed in appropriate perspective for the reason NFO attempts to maintain that the time it expended in fighting AMPI in the Western District of Texas and elsewhere should be considered in the determination of the amount of the sanctions that should be imposed against AMPI. We find and conclude that NFO's position in that regard is untenable and that NFO's view of the amount of sanctions that should be imposed against AMPI on its Rule 37 motion is grossly excessive under the circumstances.

### B.

It is appropriate that we state, however, that after careful review of Order (3) entered July 5, 1985 on Issue No. 2—NFO's Rule 37 motion, that it will not be necessary that we utilize the provision of that order which endorsed the principle that "NFO is entitled to be compensated for *at least some* of its costs and fees incurred in defending AMPI's Phase III claim." (Emphasis added). 614 F.Supp. at 755.

That order was phrased in that flexible language to provide an appropriate basis for increasing the amount of sanctions that might ultimately be imposed against AMPI in the event the Court should determine that the time expended by NFO on the matters covered by Order (1) and Order (2) entered July 5, 1985 was not sufficient to support the amount of sanctions that we might ultimately determine should be imposed against AMPI under all the circumstances. After careful review of the record, we now find and conclude that it is not necessary that we use the flexible provision of Order (3) for the reason there is no need to consider any of the time NFO expended on the defense of Phase III to sustain the amount of sanctions that we have determined should be imposed against AMPI.

Order (2) entered July 5, 1985 endorsed "the principle that NFO was entitled to compensation in regard to the San Antonio grand jury proceeding." *Id.* at 755. Viewed with 20/20 hindsight, it is apparent that Order (2) should have been more carefully phrased. For it is clear that NFO has assumed that under that order it was entitled to claim as time spent on its Rule 37 motion in this Court all the time it spent trying to get the San Antonio Grand Jury to return indictments and all the time it spent resisting AMPI's unsuccessful effort in the Western District of Texas, the Fifth Circuit, and the Supreme Court, to obtain an order from the Western District of Texas that would return the San Antonio Grand Jury material to AMPI.

We regret that Order (2) was not more precisely stated for we never intended by that order to suggest that NFO was entitled to the time spent in its Western District of Texas battle with AMPI to be considered as a factor in determining the amount of sanctions to be imposed as against AMPI. That battle, litigated in courts other than this Court, was as unrelated to the litigation that pended in this Court as still another battle NFO and AMPI elected to fight in the litigation filed by AMPI against NFO in the state courts of Wisconsin.[38]

---

**38.** AMPI once, years ago, confidently but inaccurately predicted that the case it had filed in the Wisconsin court would promptly end the war being fought in this Court. The various briefs currently filed in this Court reflect that parties cannot even agree on who may have won the expensive battles fought in the trial and appellate courts of Wisconsin.

We therefore state that Order (2) was intended only to endorse the principle that NFO was entitled to have the time spent *in this Court* in regard to the San Antonio Grand Jury proceeding as a factor in determining the amount of sanctions to be imposed against AMPI. That time was basicly expended on NFO's Rule 6(e) motions filed in this Court to obtain disclosure of the grand jury material.

Our careful and detailed review of the time NFO was required to spend in this Court in that regard supports our finding that it is not necessary that we consider any of the time expended by NFO in defending Phase III. For our review of the record establishes that AMPI's adamant resistance of NFO's second Rule 6(e) motion required NFO to spend an inordinate amount of time on a motion that should not have taken any appreciable amount of time under the circumstances.

The record establishes that AMPI's opposition to the disclosure of the San Antonio Grand Jury materials delayed the time NFO rested its case-in-chief in the trial of Phase II. Of equal, if not greater importance, AMPI's adamant resistance to NFO's Rule 6(e) motion delayed the time this Court was able to establish a factual basis for ruling NFO's Rule 37 motion and for determining the extent, if any, NFO may have been prejudiced by any failure that AMPI may have made in the production of any of the documents that were adduced in evidence before the San Antonio Grand Jury. Until those grand jury documents were actually examined, no one, including this Court, could determine whether the grand jury may have obtained possession of a substantial number of documents that NFO had never seen.

### C.

NFO's Rule 37 motion was filed January 25, 1974. On August 13, 1974 the government presented the consent decree agreed to by the parties in the separate litigation of *United States v. Associated Milk Producers, Inc.*, 394 F.Supp. 29 (W.D.Mo. 1975), *aff'd*, 534 F.2d 113 (8th Cir.1976),

*cert. denied sub nom National Farmers Organization, Inc.*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). The separate San Antonio Grand Jury proceeding was not commenced in the Western District of Texas until February 10, 1975, over a year after NFO's Rule 37 motion was filed in this Court and appropriately six months after the consent decree was presented for approval in the government's separate action against AMPI.

Both NFO's Rule 37 motion and the government's later decision to request that a grand jury be convened in the Western District of Texas were based on information initially developed during the taking of the depositions of Joseph A. Rose in November 1972 and that of Roger Hooper in November 1973. Those depositions were taken as a part of the coordinated discovery in JMPL Docket No. 83. On February 6, 1974 this Court entered an order which established the procedures under which a hearing would be held to establish the factual circumstances upon which NFO's Rule 37 motion was based.

Pursuant to that order the parties took a number of additional depositions, including but not limited to the deposition of the late Stuart Russell. The hearing was held as scheduled on March 13, 1974 and in addition to the testimony of one live witness, the parties filed a full stipulation of facts with respect to the issues raised in NFO's Rule 37 motion. At the end of that hearing, the record in NFO's Rule 37 motion was closed, subject to being reopened only upon a showing of good cause and if the Court determined a need for further testimony.

The government, of course, did not elect to file a Rule 37 motion in the separate government action. For the record shows that the government and AMPI were at that time in the process of negotiating the consent decree which was eventually presented to the Court for its approval on August 13, 1974. Our opinion in *United States v. Associated Milk Producers, Inc.*, *supra*, 394 F.Supp. 29, approved that consent decree in a modified form. That opin-

ion establishes that NFO did everything in its power to block this Court's approval of that consent.[39]

Only three of the private antitrust plaintiffs in the twenty-eight cases included in JMPL Docket No. 83 opposed this Court's approval of the consent decree in the government's case against AMPI.[40] We noted in footnote 13 on page 43 of our opinion, 394 F.Supp. 29 at 43–44 that "the Court was advised in a letter dated April 18, 1975 from counsel for the private plaintiffs in the cases filed in the Southern District of Texas that a settlement of that litigation has been agreed upon, conditioned only upon the entry of the proposed consent decree" in the government case and that "[c]ounsel for the Texas private plaintiffs accordingly urge that the public interest requires that the proposed consent decree be approved forthwith." That statement reflects the fact that the Texas private plaintiffs recognized that the proposed consent decree provided all equitable relief deemed necessary and that what those plaintiffs were primarily interested in was the recovery of treble damages.[41]

Because of NFO's efforts to intervene as a party in the government case against AMPI, and because NFO's opposition to the approval of the consent decree was time consuming, we were not able to deny NFO's motion to intervene and approve the consent decree until August 30, 1975. NFO's efforts in the Court of Appeals for the Eighth Circuit and in the Supreme Court to reverse that approval were unsuccessful.

After the consent decree was approved, the conflict between NFO and AMPI shift-ed to the Western District of Texas. For grand jury proceedings had been commenced in that district on February 10, 1975, long after NFO's Rule 37 motion was filed in this Court and after the consent decree in the government case against AMPI had been presented to this Court for approval. The lengthy proceedings in the Western District of Texas, all of which this Court was eventually required to review, establish that counsel for NFO and counsel for the Texas private plaintiffs (before the Texas cases were settled) testified as government witnesses before the San Antonio Grand Jury. By virtue of that testimony, the grand jury's attention was focused on the stipulation of facts that was admitted in evidence in this Court at the March 13, 1974 hearing on the NFO Rule 37 motion.

The separate battle NFO and AMPI waged in connection with the San Antonio Grand Jury proceeding, which the Fifth Circuit was later to describe in *In re 1975–2 Grand Jury Investigation, Etc.*, 566 F.2d 1293 (5th Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978), as a "lengthy and bitterly contested dispute," presented, among other questions, the validity of an order originally entered by Chief Judge Spears on August 25, 1976 which provided that grand jury subpoenas, transcripts and documents in the Western District of Texas grand jury proceeding "shall be disclosed to the United States District Court for the Western District of Missouri for such use in pending proceedings as that Court deems appropriate."

---

**39.** We noted in our opinion that NFO stated that if its motion to intervene in the separate consent decree proceeding was granted, NFO would attempt to rely on the Final Report of the Senate Watergate Committee, that it would call as witnesses all persons named in that report, and that it also wished to adduce the testimony of President Richard M. Nixon, together with the official files of the Executive Branch (including Presidential files and tapes).

**40.** In addition to NFO, Schepps Dairy and Sentry Food Stores filed motions to intervene and joined NFO in its request that the proposed consent decree be rejected. Schepps was one of the Texas cases that was settled. Sentry Food Stores lost its case on motion for partial summary judgment. 529 F.Supp. 1326, *aff'd*, 730 F.2d 529, *cert. denied*, —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240.

**41.** When still other cases in JMPL Docket No. 83 were settled, none of the settlement agreements entered into in those cases included any provision for any equitable relief other than that provided in the consent decree.

The August 25, 1976 order, after lengthy proceedings participated in by NFO, AMPI, and the government, was modified by Chief Judge Spears' order of October 1, 1976. The October 1, 1976 order is set out in full in *In re 1975–2 Grand Jury Investigation, Etc., supra,* 556 F.2d at 1294, n. 3, and was one of the four orders noticed for appeal by AMPI to the Fifth Circuit.[42]

NFO apparently contends, although it is difficult to say in light of the manner in which NFO has presented its claim, that all of the time and expenses incurred by it in attempting to get the San Antonio Grand Jury to return indictments and all the time and expenses expended by it in the Western District of Texas, the Fifth Circuit, and the Supreme Court in connection with *In re 1975–2 Grand Jury Investigation, Etc.* should be considered in determining the amount of sanctions that should be imposed against AMPI in NFO's Rule 37 motion. We find and conclude that NFO's apparent claim is untenable. For NFO's expenditure of time and money in the Western District of Texas may not properly be considered as reasonable time expended on the litigation in this Court. *Cf. Webb v. Dyer County Board of Education,* — U.S. ——, ——, 105 S.Ct. 1923, 1928, 85 L.Ed.2d 233, 242 (1985). NFO was serving its own purposes in separate litigation that pended in that court.

We further find and conclude, however, that the time NFO was required to spend in this Court in obtaining disclosure of the San Antonio Grand Jury material may properly be considered in the determination of the amount of sanctions that should be imposed against AMPI. It is therefore appropriate that we outline in some detail the proceedings conducted in regard to NFO's first and second Rule 6(e) motions which NFO was required to file in that regard.[43] Review of those extensive and lengthy proceedings also establishes why there is no need to resort to any of the time NFO expended in its defense of AMPI's Phase III action in order to support the amount of sanctions that we believe should be imposed against AMPI. We turn now to NFO's first Rule 6(e) motion.

### D.

For reasons that are not apparent, NFO assumed that AMPI would not attempt to appeal Chief Judge Spears' original August 25, 1976 order. For on September 24, 1976 NFO filed its first Rule 6(e) motion in this Court for disclosure of the San Antonio Grand Jury material. That motion was based on the theory that "NFO counsel should be afforded the opportunity to determine whether the Grand Jury investigation developed evidence previously concealed or withheld from NFO material to the pending Rule 37 motion and/or material to the issues in this litigation."[44]

42. AMPI attempted to appeal the October 1, 1976 order and the other three orders entered by Chief Judge Spears were eventually dismissed as non-appealable orders by the Fifth Circuit in *In re 1975–2 Grand Jury Investigation, Etc., supra,* 566 F.2d 1293. Chief Judge Spears' October 1, 1976 order, however, was stayed from the time it was entered until the Supreme Court denied AMPI's petition for certiorari on June 19, 1978. *See* 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135. As we will later note, proceedings in compliance with Judge Spears' October 1, 1976 order were commenced in this Court immediately after the stay orders of the Fifth Circuit and the Supreme Court were lifted.

43. We believe that it appropriate that we state that our recollection of the amount of the time necessarily expended on NFO's Rule 6(e) motions was not fully refreshed until we made our detailed review of the record. The fact that our

recollection needed to be refreshed may have reflected a subconscious desire to put those proceedings beyond recall. For those proceedings involved one of the few instances in which the parties failed to cooperate with each other and with the Court in an exemplary manner throughout the course of this long pending litigation.

44. NFO attached to its motion a copy of Chief Judge Spears August 25, 1976 order, a copy of the August 6, 1976 recommendation of the foreman of the grand jury and a copy of an August 27, 1976 letter written this Court by John C. Danielson, one of the attorneys in the Midwest Office of the Antitrust Division. Mr. Danielson obviously overstated the procedural situation when he advised this Court that the transcripts of grand jury testimony and the documents received by the grand jury were presently "subject to your further order at this time."

On October 18, 1976 AMPI filed a lengthy response in opposition to NFO's Rule 6(e) motion. That response pointed out that Judge Spears' August 25, 1976 order had been modified by his October 1, 1976 order. The Court was advised that AMPI had filed a notice of appeal and an application for a stay pending appeal.[45] On October 22, 1976 NFO filed a reply to which it attached another one-half inch of the San Antonio Grand Jury proceedings.

On November 2, 1976, AMPI filed what it called a "second response." On November 16, 1976, NFO filed a reply to AMPI's "second response." And on December 8, 1976, the Court received a long letter from counsel for NFO dated December 3, 1976, in which we were advised that on November 29, 1976 AMPI had filed a number of other motions in the Western District of Texas concerning the grand jury proceedings.

On January 11, 1977, this Court filed its memorandum opinion and order denying NFO's motion without prejudice. We stated in that memorandum that "the orders entered by the Honorable Adrian A. Spears, Chief Judge of the Western District of Texas, have been subject of an appeal to the Fifth Circuit Court of Appeals and that an order has been entered by that court staying Chief Judge Spears' orders pending appeal." We concluded that the questions presented in NFO's first Rule 6(e) motion could not be decided until the pending appeal to the Fifth Circuit was decided and accordingly denied NFO's first Rule 6(e) motion without prejudice.

We turn now to the circumstances under which NFO was required to file and this Court to rule NFO's second Rule 6(e) motion.

### E.

Although AMPI's notices of appeal to the Fifth Circuit in *In re 1975–2 Grand Jury Investigation, Etc.* were filed in October, 1976, that court did not decide that the various orders entered by Chief Judge Spears in the proceeding, including his October 1, 1976 order, were not appealable orders until March 3, 1978. In the meantime, the trial of Phase I of this case had commenced on June 13, 1977. The stay order issued in connection with Chief Judge Spears' October 1, 1976 order was continued by the Fifth Circuit and by the Supreme Court and thus a stay of that order remained in effect until June 19, 1978, when the Supreme Court denied AMPI's petition for certiorari to the Fifth Circuit.

By that time, the trial of Phase I of this case had been completed and the trial of Phase II had been commenced on November 28, 1977. On June 13 and 14, 1978, procedures for concluding NFO's Phase II case-in-chief were the subject of detailed discussion between the Court and counsel. On June 20, 1978, approximately a week after those conferences were conducted, the Court was required to advise all counsel in this case and counsel for the Antitrust Division that it had learned that the Supreme Court had denied certiorari the day before and that the stay order was no longer in effect. We requested the views of counsel in regard to what further proceedings should be conducted.

NFO responded on June 26, 1978 by stating that its first Rule 6(e) motion which had been denied without prejudice on January 11, 1977, and all the lengthy briefs filed in support and in opposition to NFO's first Rule 6(e) motion should be "reinstituted."[46] AMPI, having lost its Western District of Texas battle to obtain the return of the grand jury materials to AMPI, commenced a new battle in this Court to prevent disclosure of the grand jury material. AMPI's response, however, conceded that NFO's first Rule 6(e) motion be considered

---

**45.** AMPI attached a copy of the San Antonio Grand Jury proceedings, approximately one-half inch thick, to its response.

**46.** NFO requested that "this Court certify to the Clerk of the Western District of Texas, San Antonio Division, that transfer of all the grand jury transcripts and documents is warranted," and that "upon this Court's receipt of the grand jury materials, they be made available to NFO counsel for use in this case."

**1508**

as a second "reinstituted" Rule 6(e) motion and that such motion was in a posture to be ruled.[47]

In light of the unfortunate timing as to when the Fifth Circuit and Supreme Court stays were lifted, it was easy to anticipate the likelihood that NFO would refuse to close its Phase II case-in-chief until its Rule 6(e) motion was ruled. It was also easy to anticipate that AMPI would likely do everything in its power to delay the ruling of NFO's second Rule 6(e) motion, even though the granting of the motion would have permitted the disclosure of the grand jury material which, in turn, conceivably could have established, without further controversy, that NFO may have already seen substantially all of the grand jury material.

Because we viewed the necessity of closing NFO's Phase II case-in-chief as a matter of paramount importance, we spent the 4th of July weekend in 1978 working on NFO's Rule 6(e) motion. On July 7, 1978 we filed a memorandum and order granting NFO's second Rule 6(e) motion.[48]

On July 17, 1978 AMPI filed a motion for reconsideration of our July 7, 1978 order and for an evidentiary hearing. AMPI alleged that it would demonstrate that: "(1) The grand jury investigation of AMPI in the Western District of Texas was conducted without proper authorization; (2) Prosecutorial conflict of interest, in that John C. Danielson, the chief grand jury prosecutor, was one of the prosecutors in *United States v. AMPI* and has demonstrated an animus toward AMPI; and (3) Prosecutorial misuse of the grand jury process." [49]

On July 21, 1978, we filed a Memorandum Opinion and entered an order denying AMPI's motion.[50] On August 2, 1978 we were required to prepare and file still another Memorandum Opinion, which we attach as Appendix C. Orders were entered directing still further proceedings in regard to NFO's Rule 6(e) motion. Our August 2, 1978 memorandum opinion reflected that we had completed our personal examination of all of the San Antonio Grand Jury material and that we had formed "a firm tentative impression that NFO has either seen or was afforded an appropriate opportunity to see substantially all of the documents received in evidence as grand jury exhibits by the Grand Jury 75–2 Western District of Texas." NFO's Rule 6(e) motion was set for a further hearing to be held on August 14, 1978.

Pages 11,875 to 11,921 of Volume 82 of the Transcript of Proceedings reflect the proceedings conducted at the August 14, 1978 hearing. The efforts made at that hearing to obtain an order agreeable to all parties which would put NFO's Rule 37 motion in posture for ruling and which would obviate any delay in NFO's close of its Phase II case-in-chief were unsuccessful. Therefore, on August 15, 1978, we entered a number of orders of record, as shown on pages 11,923 to 11,928 of the Transcript of Proceedings. Those orders (1) required AMPI to make additional examination of the grand jury exhibits on or before September 1, 1978; (2) that after completion of AMPI's examination, NFO would examine the grand jury material and complete its examination of that material on or before September 22, 1978; (3) that

47. AMPI stated its view, of course, that "there is little likelihood that NFO can show good cause for examining any grand jury material."

48. A copy of our July 7, 1978 Memorandum and Order is attached hereto and incorporated herein as Appendix A for the reason it details the positions taken by all of the parties, including the Antitrust Division, and the rationale upon which the orders entered were based.

49. In addition to its July 17 motion for reconsideration, AMPI, on July 18, 1978, filed a request for a subpoena in aid of the motion it had

filed on July 17, 1978. On July 19 it filed an "Offer of Proof Re Requested Evidentiary Hearing." And on July 20, 1978 AMPI filed another list of material it wished to have considered in connection with its July 17, 1978 motion.

50. A copy of that July 21, 1978 Memorandum Opinion is attached as Appendix B and incorporated by this reference for the reason it reflects the lengthy proceedings conducted in regard to NFO's second Rule 6(e) motion on July 19, 20, and 21, 1978 as those proceedings appear in Volume 81, pages 11,691 to 11,858, of the Transcript of Proceedings in this case.

on or before September 22, 1978, NFO was directed to file any motion to reopen discovery in regard to particular grand jury exhibits which it wished to adduce in evidence before it rested its Phase II case-in-chief; (4) that arrangements be made to forward to this Court another four-drawer file cabinet that had somehow been inadvertently overlooked when the grand jury material had been transferred to this Court from the Western District of Texas; (5) special procedures were devised in regard to how nine particular grand jury exhibits in which AMPI had claimed an attorney/client privilege would be processed; and (6) that the disclosure of the grand jury material permitted by the orders was limited to counsel for AMPI, to counsel for NFO, and to their respective staffs.

At the close of the August 15, 1978 proceedings, the Court stated that "[i]f counsel wish to seek what they may deem to be appropriate appellate review, they shall promptly advise the Court and the Court will enter an order staying execution in order to permit counsel … to make whatever effort they want to make [for an application for a stay] in the Court of Appeals for the Eighth Circuit or any other court which they may deem to have jurisdiction under the circumstances." Vol. 82, Transcript of Proceeding at 11,928–29. An order entered on August 18, 1978 reflects that counsel for AMPI had advised the Court that AMPI did indeed intend to file a Notice of Appeal to the Eighth Circuit on or about August 21, 1978, and that counsel had made an oral application for a stay of the orders entered at the close of the August 15, 1978 proceeding.

The orders entered August 18, 1978 reflected (1) our view that the Court of Appeals should determine the question of whether any stay should be granted; (2) that the Court of Appeals would likely have an opportunity to rule any application for a stay that might be made in that court by September 1, 1978; and (3) that in the event the Court of Appeals did not take definitive action by September 1, 1978, this Court would stay execution of our August 15, 1978 orders until the Court of Appeals did take action on AMPI's application for a stay made in that court.

On September 20, 1978, the Court of Appeals denied AMPI's motion for a stay and ordered that the appeal that it had noticed should be dismissed for lack of jurisdiction. On October 5, 1978, AMPI filed a further application for a stay in this Court pending such time as the Court of Appeals would take definitive action on a motion filed by AMPI in the Court of Appeals for that court to recall its mandate and to grant a stay pending the filing of a petition for certiorari in the Supreme Court. We denied AMPI's application for further stay on October 6, 1978. We later learned that the Court of Appeals had denied AMPI's motion for a recall of mandate and for a stay of mandate that had been filed in that court on October 6, 1978.

AMPI then filed an application for a stay with Justice Blackmun as Circuit Justice for the Eighth Circuit. Justice Blackmun entered an order granting a temporary stay on October 10, 1978. On October 13, 1978, Justice Blackmun, after consideration of a response from NFO and the response of the Solicitor General, vacated the temporary stay and denied AMPI's application for stay. The Transcript of Proceedings on October 16, 1978, Volume 83, pages 11,937–38, reflect AMPI's recognition that it had run out of courts in which it could seek a stay of this Court's orders directing the procedures under which the grand jury material would be disclosed to NFO. We turn now to the further proceedings this Court was required to conduct in regard to the implementation of its July 7, 1978 order granting NFO's second Rule 6(e) motion.

### F.

It is not necessary that we review the additional procedures followed in regard to NFO's second Rule 6(e) motion in any substantial detail.[51] It is sufficient for our

---

**51.** Neither is it necessary that we detail our

October 16, 1978 discussion of a September 12,

present purposes to state that Volume 83 of the transcript, which reflects the proceedings conducted on October 16, 17, and 18, 1978; Volume 84 of the transcript reflecting the proceedings conducted on October 30, 1978; and Volume 85 of the transcript reflecting proceedings conducted on November 20, 1978 accurately reflect the fact that even after stays had been denied by this Court, by the Court of Appeals, and by the Supreme Court, AMPI still did not give up either easily or gracefully.

On November 20, 1978 we stated of record that the two inches of paper filed "since we were last together on October 30, ... reflects that the Western District of Texas Grand Jury proceedings continues to plague the progress of this case." We were able to state, however, that "at long last we will be able to reach the point today on which NFO will be able to announce that it rests its case and we can proceed with the trial." Tr. at 12,138.

Our review on November 20, 1978 of the proceedings that had been conducted since October 18, 1975 reflected that we had earlier granted NFO's additional motion to examine the transcripts of the grand jury witnesses as well as the exhibits that had been adduced before the San Antonio Grand Jury (*id.* 12,112), and that we had summarily denied AMPI's request for a stay in regard to that order. *Id.* at 12,-130.[52]

The November 20, 1978 record further shows that NFO had completed its examination of both the transcripts of all the testimony of the grand jury witnesses and all of the exhibits adduced before the grand jury before November 7, 1978. For on that day NFO filed its Motion to Adduce Additional Evidence and/or Reopen Discovery in Support of its Case-In-Chief and Rule 37 Motion. NFO's motion contained only two short paragraphs. Paragraph 1 moved that NFO "be permitted to adduce in support of its case-in-chief Government Exhibit 439 to the Grand Jury proceedings and a memorandum of 22 September 1970 from a folder entitled 'Weekly Reports' that constitutes part of Government Exhibit 459." Paragraph 2 moved that NFO be "permitted to adduce, either at trial or by deposition, the testimony of Messrs. Isham, Lilly, and Townsend in support of both NFO's

1978 AMPI press release entitled "AMPI OFFERS COMPROMISE IN KANSAS CITY LAW SUIT." It is sufficient to state that the text of and our discussion of that press release appears on pages 11,938–46 and 11,952–55 of the October 16, 1978 transcript. Those pages of the transcript reflect what we said in regard to another of AMPI's and NFO's obviously superficial and ineffective efforts to negotiate a settlement of this case. We simply reiterated and quoted in part what we said at earlier pretrial conferences held in May, 1975 and in October, 1975. We observed that "neither Mr. Elkins, president of AMPI, nor Mr. Staley, president of NFO, are seriously interested in attempting to negotiate a settlement of the pending litigation" (*id.* at 11,944) and that "'... Mr. Elkins' message to his membership and Mr. Staley's message to his membership' as it related to the litigation doing nothing but 'fatten the attorneys' coffers,' 'was simply tall talk ... directed to, theoretically, the people who milk the cows.'" *Id.* at 11,945.

We closed our discussion on that subject by saying that we recognized that "counsel in this case may again feel sensitive about additional propaganda, that the only people who stand to profit by this litigation are the attorneys in this case." *Id.* at 11,945. Counsel were assured that we would "pay no more attention to AMPI's [press] release of [its] most recent propaganda, under date of September 12, 1978, than I paid to earlier bits of propaganda to which I have made reference issued both by AMPI and by NFO." *Id.* at 11,946.

52. The record shows that the Court had "received a copy of some sort of an imaginative application which AMPI had filed in the Court of Appeals to seek some sort of a stay until it could make its mind up as to what appellate relief it might later seek" in regard to our order granting NFO the right to examine the transcripts of the testimony of the grand jury witnesses. We further stated that we "need not dwell on that particular application or inquire into what may have been its unique status, because AMPI eventually moved to withdraw that application in the Court of Appeals." *Id.* at 12,141. The Court of Appeals, of course, permitted AMPI to withdraw the final application for a stay that AMPI filed in that Court.

case-in-chief and its Rule 37 motion."[53] *See Id.* at 12,142.

Page 12,150 of the November 20, 1978 transcript shows that at the outset of that day NFO offered in evidence the two grand jury exhibits identified in paragraph 1 of its motion. *Id.* at 12,150. That record shows, however, that this Court's ruling on NFO's offer of only two exhibits out of all the grand jury materials was complicated by the position taken by AMPI. For the record shows that AMPI's lead counsel had taken it upon himself to telephone Mr. Sarbaugh of the Antitrust Division shortly before the November 20, 1978 hearing to get Mr. Sarbaugh to send the Court 3,469 additional documents to which some reference had been made in Mr. Lilly's grand jury testimony. *Id.* at 12,174–75.

The record shows the problem created by AMPI's final diversionary effort was eventually solved toward the end of a day-long effort and that toward the close of that day, NFO renewed its offer of grand jury exhibits 439 and 459. *Id.* at 12,217. Those two exhibits were given NFO trial exhibits numbers 1521 and 1522, respectively, and both exhibits were admitted in evidence. *Id.* at 12,220. The November 20, 1978 record also shows that NFO also offered in evidence Grand Jury Exhibit 465 together with seven lines from Mr. Lilly's grand jury testimony. *Id.* at 12,226.

That exhibit was marked and admitted in evidence as NFO Exhibit 1523 as a part of NFO's Phase II case-in-chief. *Id.* 12,232. NFO immediately stated after the admission of the third exhibit that NFO rested its case-in-chief. *Id.* It is thus clear that the ultimate result of NFO finally getting a look at all of the San Antonio Grand Jury materials established that it had already seen all of those documents as a result of the proceedings conducted in this Court in connection with NFO's Rule 37 motion and that all the time expended on NFO's Rule 6(e) motions resulted in NFO's introduction of only three exhibits in evidence in support of its case-in-chief.

The record shows that when NFO rested its Phase II case-in-chief, the Court recognized that it was at long last in a position to rule NFO's Rule 37 motion and accordingly granted that motion. *Id.* at 12,212. We stated in that regard that "[t]he basic question presented in regard to NFO's motion for sanctions does not really relate to whether that motion should or should not be granted, but the difficult question in the case has always been what consequences flow from AMPI's actions and how much NFO may have been prejudiced under the circumstances of this case." *Id.* at 12,213.

Our review of the procedural history of the circumstances under which NFO filed its Rule 37 motion on January 25, 1974 and the circumstances under which the Court was finally in a position to rule that motion on November 20, 1978, establishes that the time spent by NFO in regard to its Rule 6(e) motions for disclosure of the San Antonio Grand Jury materials was sufficient to support an appropriate amount of monetary sanctions that should be imposed against AMPI without resorting to any consideration of any of the time that NFO expended on its defense of AMPI's Phase III action against NFO.

That review, however, does not establish the specific amount of sanctions that should be awarded NFO on its Rule 37 motions. We turn now to a particularized

---

**53.** NFO suggestions in support made clear that it wanted to adduce pages 146–153 of Mr. Lilly's grand jury testimony in regard to an "issue raised by defendants of the authenticity and admissibility of NFO Exhibit 365."

In regard to NFO Exhibit 365, we stated that the "admissibility question is already out of the picture because I have admitted that exhibit in evidence" (Vol. 85, Tr. at 12,146) and that "I frankly do not understand NFO's concern about the authenticity of NFO 365, and while the Grand Jury testimony probably clarifies whose handwriting the memorandum of a meeting on April 4, 1972 may have been written in, it would certainly seem apparent that ... this Court is going to continue to regard NFO 365 an authentic document." *Id.* at 12,147.

discussion of both sanction motions that presently pend for determination.

### G.

We shall first discuss AMPI's motion for sanctions. For the amount of sanctions that should be imposed against NFO may be determined without substantial difficulty. AMPI's motion prayed for an order imposing sanctions against NFO in what must be viewed as a relatively modest "amount of $34,918.37 for fees and disbursements incurred with respect to: 1) NFO's concealment and destruction of documents in this litigation; and 2) AMPI's resulting Motions to Compel and Motions for Sanctions against NFO." AMPI Motion at 1.

AMPI's supporting suggestions stated that it had, pursuant to this Court's August 2, 1985 Order, "sent NFO's counsel an itemization of the fees and disbursements, which total $34,918.37, including $26,028.94 for fees and $8,889.43 for disbursements" on August 30, 1985. AMPI stated that on "September 20, 1985, the parties conferred face-to-face in an attempt to reach a settlement of this matter, but were unable to do so." AMPI Supporting Suggestions at 1–2. AMPI argues that its "claim is eminently reasonable and devoid of any over-reaching" and that the reasonableness of its claim "stands in stark contrast to NFO's extravagant, 'kitchen sink' approach in requesting over $18,000,000 in attorneys fees, over $1,000,000 in costs and over $1,000,000 in Rule 37 sanctions against AMPI." *Id.* at 2.

NFO's Suggestions in Opposition to AMPI's Motion show that the parties are only $33,522.17 apart in regard to the amount of sanctions that should be imposed on NFO. For NFO has stated in its Opposition Brief that it "agrees not to contest the allocation of $1,396.20 of Watson Ess time." NFO, of course, opposes all of the remainder of the $33,522.17 sanction proposed by AMPI.[54]

NFO's Response argued that AMPI's Submission to the Court failed to "include any evidence of its time calculations [or] any backup material to support its claim." NFO accordingly contended that "AMPI's submission with this court, just as its earlier mailing to NFO, is woefully deficient in documentation and support" and stated that it was "because of this lack of supporting materials that NFO cannot properly assess AMPI's application and hence cannot agree to it." NFO Suggestions in Opposition at 3.[55]

In an obvious effort to attempt to shift the blame for the breakdown of the settlement negotiations conducted by the parties, NFO suggested that it had, pursuant to this Court's August 9, 1985 Order, furnished AMPI on August 30, 1985 "with a specific 442 page itemization of its legal fees and costs incurred in connection with the NFO Rule 37 motion against AMPI, the San Antonio Grand Jury and the amount of time NFO devoted to Phase III."[56] NFO further argued that there is a "striking ... contrast between AMPI's claim and the 442-page specification of costs and fees request submitted by NFO in support of its Rule 37 motion" (*id.* at 6), and that NFO's

---

54. NFO stated that it made its $1,396.20 concession in regard to Watson Ess time in spite of the fact that it viewed that the Watson Ess portion of AMPI's claim as "somewhat sketchy." NFO explained, however, without the slightest indication that it was speaking facetiously, that it made what it apparently viewed as a major concession for the reason that "NFO does not wish to convert this process into a 'second major litigation'. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)." NFO Suggestions in Opposition at 6.

55. NFO's Response did not contain any request that this Court direct AMPI to furnish it any "supporting materials" that may have enabled NFO to agree to AMPI's submission.

56. NFO argued that the "materials NFO gave to AMPI included an explanation of the methodology used, a chart setting out the attorneys involved on those portions of the case; the amount of billing time for each of those attorneys allocated for compensation, and a set of the actual time descriptions for the period in question." *Id.* at 2.

allocation of time to its Rule 37 motion and to the San Antonio Grand Jury matter "could be easily verified."

The briefs filed in support of and in opposition to AMPI's motion for sanctions establish that the parties agree that there is a contrast in the submissions made by the parties in regard to their respective motions for sanctions. AMPI describes that contrast as a "sharp contrast"; NFO states that it is a "striking contrast." We agree that there is indeed a sharp and striking contrast between the manner in which the parties have attempted to support their respective motions for sanctions. We do not agree, indeed we expressly disagree, with NFO's notion that the allocations of time contained in its Rule 37 Submission can be said to be "easily verified."

Our necessarily time-consuming examination of the manner in which NFO has made its various blanket multi-million dollar claims for sanctions and for attorneys' fees and costs requires this Court to state that NFO's claims can only be verified by the conduct of a second major litigation.[57]

■ We find and conclude that AMPI's supporting data is sufficiently detailed to support a determination of the amount of sanctions that should be imposed against NFO.

AMPI's submission is not a model to be followed in future cases. AMPI did not, for example, follow the "preferred practice" of attaching "contemporaneously recorded time sheets." *See Webb v. Dyer County Board of Education, supra,* —— U.S. at —— n. 6, 105 S.Ct. at 1926 n. 6, 85 L.Ed.2d at 239 n. 6. The affidavits attached to AMPI's submission, however, specifically stated that AMPI's request was based on both "the billing records and/or the daily time diaries" of attorneys involved.

We agree with NFO's suggestion that "AMPI could have easily provided copies of its paraprofessionals' worksheets." NFO's Suggestions in Opposition at 5. NFO, however, does not suggest that it ever requested production of the supporting worksheets or that AMPI refused production. Under the circumstances, we find that further controversy in regard to AMPI's submission should not be prolonged. If, however, NFO wishes to see the worksheets at this late date, it shall request their production from AMPI. Should AMPI refuse production, a circumstance that is not to be anticipated, the Court will enter an order directing production before final judgment is entered on AMPI's motion.

We turn now to NFO's Rule 37 motion.

## H.

Pages 1 to 4 of AMPI's response to NFO's Rule 37 motion, accurately states the difficulties and problems presented in the manner in which NFO presented the data in support of its motion for sanctions. AMPI there stated that "NFO's Rule 37 Submission of October 3, 1985, purports to set forth NFO's latest version of its computations relating to its claim for sanctions against AMPI." *Id.* at 1. The basic thrust of AMPI's full argument, elaborated in an 81-page brief to which four appendices were attached, will be understood from its summary statement of its view of the problems presented by NFO's Submission.

AMPI stated, and we generally agree, that those problems "are at least fourfold: (1) NFO counsel's time entries are uniformly vague, duplicitous, unexplained and uninformative of the services purportedly included therein; (2) NFO counsel have not even attempted to segregate their efforts allegedly performed with reference to the Rule 37 and San Antonio grand jury pro-

---

**57.** Examination of the proceedings conducted in the district court in *In re Fine Paper Antitrust Litigation,* 98 F.R.D. 48, 80, n. 19 (E.D.Pa.1983) (somewhat reluctantly but nevertheless approved by the Third Circuit in 751 F.2d 563, 584–587 (3d Cir.1984)) should give the parties some insight in regard to how a major litigation involving no more than attorneys' fees and costs must necessarily be conducted.

ceedings even though they knew, or should have known, that they would eventually attempt to assert a claim for Rule 37 attorneys' fees; (3) Mr. Donohoe's allocations of the time of NFO counsel to the matters at hand can be based on nothing more than speculation, assumptions and surmise, giving the benefit in all instances of any doubts to NFO; and (4) there has obviously been a lot of overlawyering and 'churning' of attorney time unrelated to the results obtained." *Id.* at 1–2.

AMPI added that "[n]o sense can be made by AMPI counsel of the present NFO Submission and unfortunately the Court will have the same problems in attempting to rule the matter." *Id.* at 2. AMPI, however, did suggest that as close as it could tell, "NFO appears to be claiming a grand total of 10,755.71 hours of its attorneys' time for the Rule 37 motion, the San Antonio grand jury proceedings and the Phase III defense" (*id.* at 2) and that if that time is assessed at NFO's "current rates," as NFO claims it should be, it would amount to the sum of $1,250,345.10. *Id.* at 3.

If the assessment is made as NFO requested on August 31, 1983 when it first filed its motion for monetary sanctions, it would amount to the sum of $1,075,571. *Id.* at 3. AMPI argued that in "either event, sanctions of this magnitude are neither supported by the documentation contained in NFO's Submission, nor by the Court's ruling on Issue No. 2 on July 5, 1985." *Id.* at 3.[58]

AMPI concluded its argument by stating on pages 80–81 of its response that this "Court clearly possesses the authority to reject the NFO Submission outright and deny all fees to NFO." AMPI argued that

such "authority should be exercised by the Court in view of the complete failure of NFO to sustain its burden of producing satisfactory evidence of the amount of its reasonable fees." *Id.* at 80–81.

It is thus clear that in regard to NFO's motion for sanctions, the parties are only approximately one million dollars apart in total fees to be awarded, give or take a quarter of a million dollars, dependent upon what hourly rate may be applied.

## I.

The Court of Appeals' implicit suggestion that a greater sanction should be imposed against AMPI than against NFO is consistent with the factual circumstances we have detailed in earlier parts of this memorandum opinion. For it is clear that AMPI's unyielding opposition to the disclosure of the San Antonio Grand Jury materials, a disclosure which we find was necessary to afford a factual basis for the determination of the extent of prejudice that NFO may have suffered in regard to its Rule 37 motion, caused NFO to spend substantially more time in litigation in this Court than AMPI was required to spend in developing the factual circumstances in regard to NFO's destruction of documents.

 While it is virtually impossible to make a line-by-line analysis of the NFO's Submission in support of its Rule 37 motion, it is clear that NFO's Submission includes claims for a great deal of time expended on matters other than the time expended on the litigation in this Court. In spite of the inadequacy of NFO's submission, we are nevertheless satisfied that the amount of sanctions that should be im-

---

**58.** AMPI's response further advised the Court that "at one point in the interest of settlement, AMPI had believed that $50,000 was more than fair compensation for NFO's Rule 37 motion and related efforts" but that in "the face of the patently inadequate documentation that NFO has submitted, however, AMPI believes that even this sum is not presently justified." *Id.* at 3–4. We are advised on page 10 of NFO's Reply

Brief that AMPI's $50,000 offer was withdrawn after the breakdown in the parties' settlement negotiations.

We pay no attention to those apparent "settlement" negotiations. Those "negotiations" simply establish, once again, that NFO and AMPI are very long on litigation and very short on effective settlement negotiations.

posed against both NFO and against AMPI may be reasonably determined. For the attention of this Court was necessarily focused on all of the proceedings conducted in this Court in regard to NFO's Rule 37 motion and its Rule 6(e) motions, all of which had been detailed above. The Court is also familiar with the amount of hours that could have been reasonably expended and the reasonable rates that attorneys could charge for the services rendered in regard to those proceedings.

Although we fully expected that NFO's Submission would have been presented in accordance with the documentation standards stated in *Hensley, see* 461 U.S. at 433,[59] that expectation was not realized. In spite of that deficiency, which we find does in fact exist, we are nevertheless satisfied that there is a reasonable basis on which the determination of the amount of sanctions to be imposed against AMPI may be reasonably made.

The point of beginning is consideration of AMPI's motion that prayed for a total sanction of $34,918.37. As is apparent from what we have stated above, NFO presented only token opposition to AMPI's prayer for a sanction in the total amount of $34,918.37 in its six-page brief in opposition to AMPI's submission.[60] Based on our intimate knowledge of this long-pending litigation, we find and conclude as a first step that AMPI's motion should be granted in the full amount of $34,918.37 prayed for and that an appropriate order should be so entered.

Based on that same intimate knowledge of this litigation, our careful review of the proceedings above detailed, and our examination of NFO's submission, we are satisfied that we are able to determine the

amount of sanctions that should be imposed against AMPI. We find and conclude that the time expended by NFO in the proceedings conducted in this Court in regard to NFO's Rule 37 motion, including the time necessarily spent on NFO's two Rule 6(e) motions which we find were directly related to its Rule 37 motion, may be reasonably estimated to be approximately five times that expended by AMPI in its motion.

*Hensley* recognized that there is "no precise rule or formula" for the determination of fee awards. 461 U.S. at 436, 103 S.Ct. at 1941. We believe the same rationale is applicable to the determination of the amount of sanctions. In both instances, we believe that under the discretion vested in a district court in making the "equitable judgment" involved, it may either (1) "attempt to identify specific hours that should be eliminated," or (2) "it may simply reduce the award" sought by the prevailing party. *Id.* at 436–37, 103 S.Ct. at 1941. Under the circumstances of this case, the only available alternative is an appropriate reduction of the amount of sanctions sought by NFO. For it is our considered judgment that the manner in which NFO has made its submission makes it impossible to identify the specific hours that should be eliminated.

We recognize that the estimate made is not based on any mathematical calculation. We are nevertheless satisfied that the estimate is a reasonable one under the circumstances that we have detailed. Accordingly, we find and conclude that a sanction in the amount of five times the sanction imposed against NFO will be imposed against AMPI. Because our determination is not based on any precise rule or formula, we

---

**59.** *See also Webb v. Dyer County Board of Education,* —— U.S. ——, n. 6, 105 S.Ct. at 1926 n. 6, 85 L.Ed.2d at 239 n. 6 (1985), in which the Court cited Chief Justice Burger's concurring opinion in *Hensley* to support its conclusion that "Contemporaneously recorded time sheets are the preferred practice" rather than a "reconstruc-

tion of the hours his counsel spent on the matter."

**60.** NFO's opposition brief was in large part directed to a self-congratulatory description of the 442-page submission NFO made in support of its Rule 37 motion.

round AMPI's $34,917.37 figure to $35,000 and will enter an order imposing a sanction against AMPI five times that rounded figure which results in the amount of $175,-000.

We turn now to the further proceedings that must necessarily be directed to advance the ultimate termination of this litigation.

## VI.

The parties will soon be on their way back to the Court of Appeals. Controversy over what issues are to be presented for appellate review should be avoided. Orders will therefore be entered directing that the Clerk, in accordance with Rule 58 of the Federal Rules of Civil Procedure, enter final judgments in regard to all orders entered July 5, 1985 and all orders that will be entered this day. Any number of the judgments that will be entered on those particular orders will clearly be subject to appeal as of right under 28 U.S.C. § 1291 and Rule 4 of the Federal Rules of Appellate Procedure. Other orders, however, may be subject to immediate appeal only by permission under 28 U.S.C. § 1292(b) and Rule 5 of the Federal Rules of Appellate Procedure.[61] The parties will be directed to confer for the purpose of agreeing on the form of the judgments to be entered.

Should counsel entertain any doubt about whether a particular order may be subject to immediate appeal as of right, the form of judgment for such an order should include a statement that the Court has, pursuant to Rule 54(b) of Federal Rules of Civil Procedure, expressly directed the Clerk to enter a final judgment in regard to the issue decided by such an order and that the Court has made an express determination that there is not any just reason for any delay for the taking of an immediate appeal pursuant to 18 U.S.C. § 1292(b). The judgment entered in regard to such an

order should also include a statement of this Court's opinion, as required by Section 1292(b), that an immediate appeal from all the various orders entered would materially advance the ultimate determination of the litigation.

Experience in this case establishes that the parties are committed to litigation rather than disposition by negotiation of any and all issues that may be litigated. It is our considered judgment that the sooner the parties are again sent on their way to the Court of Appeals and to the Supreme Court in regard to all issues that may be presently noticed for appeal, the sooner will this long-pending litigation be terminated. The orders that will be entered will permit the parties to agree on the form of all judgments to be entered so that their respective appeals may be noticed in a manner that will avoid appellate complications that might otherwise arise.

Accordingly, it is

ORDERED (1) that NFO's motion for clarification should be and is hereby denied. It is further

ORDERED (2) that NFO's motion for sanctions should be granted and that sanctions should be and are hereby imposed in the amount of $175,000 against AMPI. It is further

ORDERED (3) that AMPI's motion for sanctions should be granted and that sanctions should be and are hereby imposed against NFO in the amount of $34,918.37. It is further

ORDERED (4) that both NFO's attorneys' fee petition and NFO's separate bill of costs motions should be and are hereby denied without prejudice. It is further

ORDERED (5) that in order to give counsel an appropriate opportunity to reach agreement in regard (1) to the forms of final judgments that should be entered in order that appropriate and immediate appeals may be noticed in regard to any of the orders entered July 5, 1985 and any of the orders this day entered which any par-

---

**61.** *Coleman v. Sherwood Medical Industries,* 746 F.2d 445 (8th Cir.1984), for example, holds that an order imposing a sanction for failure to comply with a discovery order is not appealable as a matter of right under Section 1291.

ty wishes to notice for appeal, and in regard (2) to what further proceedings if any, that may to be directed, counsel are directed:

(a) To promptly schedule a conference of counsel for the purpose of attempting to reach an agreement (1) in regard to the forms of final judgments to be entered as above stated, and (2) in regard to any further proceedings that may need to be directed under the circumstances.

(b) If counsel are able to reach full agreement on those subjects, such agreement, together with all proposed forms of final judgment and all proposed orders shall be presented to the Court for its approval on or before June 30, 1986.

(c) In the event counsel are not able to reach full agreement, each party shall separately prepare, serve, and file their proposed forms of final judgment and their respective proposed orders together with a short statement in support of their respective positions, on or before June 30, 1986.

(d) If the parties agree that an extension of time beyond the June 30, 1986 deadline above stated should be granted, they shall present for approval of the Court an agreed order extending that deadline for a reasonable period of time.

(e) In the event counsel agree that a conference with the Court may contribute to counsels' efforts to reach agreement, such a conference, upon the written request of counsel made prior to the June 30, 1986 deadline or the date of any extended deadline, will be promptly scheduled at a time convenient to the Court and counsel.

Any request for a conference with the Court shall include an agreed agenda of the matters counsel wish to have considered at the requested conference.

### APPENDIX A

### MEMORANDUM AND ORDERS GRANTING NFO'S RULE 6(e) MOTION AND DIRECTING FURTHER PROCEEDINGS

#### I.

This Court, at long last, is in a position to rule NFO's long pending Rule 6(e) motion for release of grand jury minutes filed September 24, 1976. That motion seeks "disclosure to NFO counsel of the transcript and exhibits of the 1975–2 Grand Jury which investigated AMPI in the Western District of Texas." The NFO motion further alleges that "this Court has control over the material in question pursuant to the order of Chief Judge Spears entered in the Western District of Texas on August 25, 1976."

*In re. 1975–2 Grand Jury Investigation,* 566 F.2d 1293 (5th Cir.1978), shows that on October 1, 1976, Chief Judge Spears reconsidered and modified the August 25, 1976, order referred to in NFO's pending Rule 6(e) motion. The relevant October 1, 1976, order is set forth in full in footnote 3 on page 1294 of 566 F.2d. That order became a final order when the Supreme Court denied *certiorari* 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978).

On June 20, 1978, this Court directed counsel in the above case and counsel for the Antitrust Division of the Department of Justice to prepare, serve, and file their respective suggestions in regard to what procedures should be followed concerning that portion of Chief Judge Spears' October 1, 1976, order which provided that:

In the event the transferee judge [Chief Judge Oliver] finds at any time that there is a compelling need for all or any part of the said grand jury subpoenas, transcripts and documents, and certifies that the transfer thereof is warranted, the Clerk shall forthwith transfer the requested material to the transferee judge.

NFO suggested in response to this Court's June 20, 1978, direction, that "this Court certify to the Clerk of the Western District of Texas, San Antonio Division, that transfer of all the grand jury transcripts and documents is warranted" and that, "upon this Court's receipt of the grand jury materials, they be made available to NFO counsel in this case."

AMPI attached to its suggestions a copy of a letter counsel for AMPI had written

Chief Judge Spears on June 23, 1978, in which it requested that Chief Judge Spears hear a motion which AMPI had filed on November 29, 1976. In that motion AMPI requested an evidentiary hearing in regard to the manner in which Chief Judge Spears' order of October 1, 1976, had been implemented. AMPI also suggested that "if Chief Judge Spears holds an evidentiary hearing in response to AMPI's November 29, 1976, motion," it is possible that his Order of October 1, 1976, "may be modified or dissolved." [1] AMPI then suggested that:

> Nevertheless, assuming that Chief Judge Spears' October 1, 1976 Order is not modified or dissolved, release of grand jury materials cannot be accomplished except through a showing of particularized and compelling need by motion under Rule 6(e), Federal Rules of Criminal Procedure. NFO has filed such a motion and AMPI has responded. It is now ready for ruling by the Court.... If the Court decides that disclosure is appropriate, then certification should be made to the Western District of Texas of the compelling and particularized need, together with a specification of the documents that should be transmitted.

Mid-Am suggested that "the San Antonio Grand Jury materials are not relevant to this case unless the Court finds that there is some compelling need for examination of those materials" and that "the Grand Jury material should not be allowed to further clutter up this already complex case."

CMPC noted that it was not "directly involved in the controversy" concerning the grand jury materials but that it was "affected by any developments that may delay the processing and final disposition of the central issues of this case." CMPC further suggested that "NFO's effort to obtain access to the San Antonio grand jury documents is nothing more than an attempt to reopen discovery" and accordingly objected to NFO's use of the grand jury materials for any purpose in this case.

ARSPC, after reviewing the suggestions by the other parties, noted it was not directly involved and that the Court had received "ample suggestions for handling the matter."

The Antitrust Division took a position consistent with its stand in the Western District of Texas—namely, that it had "no objection to the entry of such order as the Court deems appropriate to make the grand jury subpoenas, transcripts and documents available to Chief Judge Oliver for such use as he deems appropriate in connection with the [private plaintiffs'] Rule 37 motions and the trial of the JPML 83 cases." 566 F.2d at 1296. The Antitrust Division suggested that:

> The threshold question is whether disclosure of the grand jury material is needed in disposing of the Rule 37 motion. If the Court finds that other procedures to dispose of that motion are adequate and there is no compelling need for disclosure of grand jury materials, no inquiry into the grand jury materials would be warranted.

The Antitrust Division further suggested that "if the Court finds that an inquiry into the grand jury materials is warranted ... [a]ll parties to the Rule 37 motion will be permitted to inspect the grand jury documents." In a footnote the Antitrust Division stated:

> The showing of a compelling need for disclosure of grand jury documents appears to be less burdensome than the showing for disclosure of grand jury testimony. Where disclosure of documents is sought for their content and existence, that is, for their intrinsic value in furtherance of a lawful purpose rather than to learn what took place before the grand jury, such documents may not be

---

1. Chief Judge Spears' order entered June 29, 1978, denying AMPI's November 29, 1976, motion without prejudice, eliminated any possibility that his Order of October 1, 1976, would be modified or dissolved.

matters "occurring before the grand jury" within the meanings of Fed.R. Crim.Pro. 6(e) [citations omitted].

The Antitrust Division is apparently of the view that the procedures which it believes should be followed in regard to documents produced before the Western District of Texas grand jury may be different from the procedures which should be followed in regard to the testimony of witnesses before the grand jury. The following suggestion made by the Antitrust Division at least implies that the Court should make an *in camera* inspection of the testimony of grand jury witnesses in order to determine what, if any, portion of such testimony should be disclosed:

> If the court finds that the documents were not produced in compliance with the discovery program, were required to be produced in the discovery program, are material to the litigation, and are needed to dispose of the case on its merits, the parties (a) may use the documents in support of the Rule 37 motion and in the litigation of the case; (b) may have access to testimony, if any, of grand jury witnesses bearing on these documents after the Court has determined *in camera* the portions of the testimony to be disclosed; and (c) may use the portions of the testimony in interrogating witnesses who are deposed or who testify at a court hearing.

In connection with its recommended *in camera* inspection of at least the testimony of the grand jury witnesses, the Antitrust Division stated:

> The Chicago Office, Antitrust Division, will provide the Court with the names of the grand jury witnesses, if any, who it believes gave testimony bearing on the documents, but suggests that the Judge's law clerk, or someone designated by the Court, read the testimony and suggest to the Court the portions of the transcripts that should be disclosed.

We are satisfied that we have jurisdiction of NFO's pending Rule 6(e) motion and

that such motion should be granted. We find, however, that we are not in complete agreement with any of the suggestions made by the parties or by the Antitrust Division in regard to what procedures should be followed as a result of the entry of our interlocutory order granting NFO's Rule 6(e) motion. We are of the view that our order of disclosure made pursuant to Rule 6(e) should, for the time being, be limited to disclosure to this Court, and to this Court alone, in order that it may personally make an *in camera* inspection of the grand jury materials in order to determine what further orders of disclosure may be appropriate under the circumstances.

We are grateful for the assistance offered by the Antitrust Division and may make use of that assistance. We do not believe, however, that any examination of the grand jury material should be delegated to a law clerk or to anyone else who may be designated by the Court, as the Antitrust Division suggested. We agree with the Antitrust Division suggestion that the procedures to be followed in regard to the documents may be different from the procedures which should be followed in regard to the testimony of the witnesses, but we do not need to reach that question at this time. We want to look at the documents *in camera* before determining what procedures may be proper under the circumstances.

## II.

Rule 6(e) prohibits the disclosure of matters occurring before a grand jury except "only when so directed by the court preliminarily to or in connection with a judicial proceeding." Rule 6(e) has consistently been construed to authorize a district court other than the district court which impanelled the grand jury to rule a Rule 6(e) motion to permit disclosure. The suggestions filed in this Court by the Antitrust Division and by all parties show that no one has questioned this Court's jurisdiction to rule the pending Rule 6(e) motion under

the circumstances of this case. Indeed, AMPI, the party most concerned, implicitly concedes this Court has jurisdiction to rule the pending Rule 6(e) motion under the circumstances of this case by its reliance in the Fifth Circuit upon *State of Illinois v. Sarbaugh*, 552 F.2d 768 (7th Cir.1977), and by its unqualified statement in the suggestions it filed in this Court which we have quoted above.

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), establishes that Rule 6(e) is but declaratory of principles long recognized by Supreme Court and lower federal court decisions that disclosure is "committed to the discretion of the trial judge." The familiar Supreme Court cases cited in *Pittsburgh Plate Glass* were *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed.2d 1129 (1940), *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), and *United States v. Johnson*, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed.2d 1546 (1943).

The Supreme Court cases decided before *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), were the basis for the recognized rule that the discretion vested in the district judge ruling a Rule 6(e) motion should not be exercised in favor of disclosure unless the party seeking disclosure carries the burden of showing a "particularized need" or "compelling necessity" which outweighs the long established policy of secrecy of grand jury proceedings.

We have elsewhere stated in detail, *see* Part III of *United States v. National Dairy Products Corp.*, 262 F.Supp. 447, 452–53, (W.D.Mo.1967), aff'd in part and rev'd in part 384 F.2d 457 (8th Cir.1967), that *Dennis* did not establish new principles or standards different from those long established in the earlier Supreme Court cases. The Annotation on *Inspection— Grand Jury Minutes*, 3 A.L.R.Fed. 29 (1970), however, shows that it is far easier to state the principles applicable to grand jury disclosure than to apply those principles to the varied and sometimes unique factual situations which are presented under the facts of a particular case.

It is not a difficult task to make the requisite finding of "particularized need" under the undisputed circumstances of this case. The Antitrust Division's suggestions filed at our request accurately state that one "threshold question is whether disclosure of the grand jury material is needed in disposing of the Rule 37 motion." That motion, filed by NFO early in 1974, sought sanctions against AMPI for alleged shortcomings in AMPI's document production in JPML Docket No. 83 and in this case.

We need not recite in detail the procedures directed and followed in connection with that Rule 37 motion other than to say that the stipulation of facts upon which that motion was to be determined was filed March 13, 1974, before the grand jury impanelled in the Western District of Texas commenced its investigation of AMPI in the Spring of 1975. Once the grand jury investigation was commenced, it became obvious to this Court and to counsel for NFO and AMPI that the determination of the Rule 37 motion was closely intertwined with the grand jury investigation in the Western District of Texas.

The briefs filed in support and in opposition to AMPI's motion for summary disposition of NFO's Rule 37 motion filed January 24, 1977, reflected NFO's contention that "there is light which probably will be shed upon these proceedings by the evidence gathered by the 1975–2 Grand Jury of the Western District of Texas, which was investigating AMPI's conduct with respect to this very litigation." NFO expressly incorporated by reference "its filings in this Court on its motion for disclosure of that evidence and the order entered thereon." AMPI, of course, took the position that it was improper for this Court "to delve into the records of the San Antonio Grand Jury" for the reason that "it is

AMPI's position until the Court rules otherwise, the record on this Rule 37 motion consists of the joint stipulation of facts agreed to in March of 1974, plus the testimony of one witness taken at that March, 1974 hearing *and nothing else* " (emphasis ours).

The transcript of pretrial proceedings held November 15, 1976, reflects that this Court's consideration of the Rule 37 motion was being delayed by the stay order issued by the Court of Appeals for the Fifth Circuit in connection with Chief Judge Spears' order of October 1, 1976. After counsel for AMPI had advised the Court that the Fifth Circuit had granted a stay (p. 175 of November 15, 1976, transcript) we stated:

Now, for reasons which apparently are valid reasons to AMPI, it is obvious to this Court that you want to exhaust every possible legal ground, and I am not critical of you for doing it, to keep anyone from taking a look at documents which would establish, beyond any question, that nothing produced by AMPI to the West Texas Grand Jury and nothing as far as you know produced by any third party nor any testimony taken by that Grand Jury support any notion whatever that AMPI withheld and destroyed and put in the shredder documents that they were obligated to produce in connection with this litigation.

Now, I can think of a great many ways in which you get some confirmation of your position, but I cannot conceive that it would be proper for AMPI to judge its own case and to say, "We make that assertion but we don't want anybody else to take a look at the documents." [p. 181 of November 26, 1976 transcript].

On page 183 of the November 15, 1976, transcript we forecast the action which we were not able to take until June 20, 1978. We there stated:

My present disposition, unless counsel can figure out something else, is to wait a reasonable period of time to see whether the Honorable Chief Judge Adrian

Spears' order becomes a final order. If it does, I will probably call on counsel for suggestions as to what communication should be made and what procedure you think ought to be established and followed at that time.

And on page 188 of the November 15, 1976 transcript we stated:

I have difficulty in understanding why the parties don't devise easy procedures to set at rest suspicions that are lurking around and why AMPI would take any different position than the government took when it was charged with having instituted *United States v. AMPI* as a result of a part of wheeling and dealing in Watergate, but that is for AMPI's determination. If they want to run it the full way, we will run it the full way, but I have a strong suspicion that every court that is presented with the question is going to have a considerable curiosity as to what is in those documents.

We find and conclude that there is a compelling and particularized need for disclosure of the grand jury material in order for this Court to rule the Rule 37 motion and in order for it to determine whether AMPI made the discovery it was obligated to make under the pretrial orders and directions made in connection with this Court's processing of JPML Docket No. 83 and the case presently on trial. The first and obvious inquiry that must be made in connection with both questions is a determination of what documents AMPI actually produced during JPML Docket No. 83 discovery and a comparison of those documents with documents produced for the Western District of Texas grand jury. The fact, should it prove to be a fact, that more documents may have been produced for the grand jury does not by any means decide all the questions presented. But the ascertainment of such a fact is a necessary beginning point.

This Court cannot properly overlook the purpose for which the grand jury in Western District of Texas was impaneled.

AMPI's response to NFO's Rule 6(e) motion, filed in this Court on October 18, 1976, conceded in its opening sentence that "[f]or more than a year, a grand jury in San Antonio, Texas, investigated whether any violation of federal law occurred during discovery of AMPI documents in this Court." The letter of appointment of John C. Danielson as a Special Attorney by the Assistant Attorney General, Antitrust Division of the Department of Justice, January 7, 1975, states the following:

The Department is informed that violations of federal criminal statutes may have been committed by persons representing Associated Milk Producers, Inc., in complying with the pre-trial discovery order in *U.S. v. AMPI, INC.*, 74 CV 80–W–1 (W.D.Mo) filed February 1, 1972.

The Department has reason to believe that an indictable offense may have been committed and, accordingly, investigation and consideration by a grand jury seems appropriate.

The Antitrust Division vigorously opposed AMPI's motion to modify Chief Judge Spears' original order of August 25, 1976. In its final reply filed before Chief Judge Spears, the Antitrust Division stated:

Finally, in its third pleading filed in this cause (*AMPI Response to Reply ... and Further Memorandum ...*, etc. dated September 10, 1976), AMPI explains what action it wishes of the Court. Not only does it request that all documents impounded from the grand jury at once be dispersed to their owners (*id.* at 14), but AMPI advocates also that:

All of the subpoenas and testimony transcripts should be suppressed and destroyed by this Court (*ibid*).

This prayer must come as a considerable shock to a Court charged with administering justice simply and fairly so as to ascertain the truth (Rule 2, Federal Rules of Criminal Procedure; Rule 1, Federal Rules of Civil Procedure; Rule 102, Federal Rules of Evidence). The United States opposes this motion, and respectfully urges reaffirmance of the Court's order of August 25, 1976.

And the Antitrust Division concluded its final reply by properly stating that:

Unless this Court's order of August 25 becomes operative, the Western District of Missouri will never become aware of what took place in the JPML 83 discovery proceedings. The Government is not free, under the strictures of Rule 6(e), to make such a disclosure, and AMPI is obviously unwilling to do so, despite ABA Disciplinary Rule 7–102(B)(1). If the facts revealed to the grand jury are contrary to those represented in the District Court in Kansas City, it is obviously in the interest of justice that materials which may reveal such facts be disclosed to that Court if it chooses to see them, and as promptly as possible. Since any federal trial is a search for the truth, one litigant should not be entitled to unique access to (much less the power to suppress) testimony pertinent to that inquiry. While AMPI's knowledge may well be persuasive to the Court in Kansas City in making further disclosure it points up the public interest in making this grand jury's information available to that Court, to test, if it sees fit, what AMPI asserts (page 3) to be "vague and unsupported allegations."

There is still another separate and independent particularized need for disclosure under the most exceptional circumstances of this case. This case is in its second year of trial. While Phase I of the trial has been completed, the trial of Phase II has almost reached the point that NFO will have adduced all evidence known to it. But NFO cannot properly be required to close its case in chief on its claim against Mid-Am, AMPI, CMPC, and ARSPC until it is determined whether it may have a right to reopen discovery, dependent upon what may be revealed by examination of the grand jury material and other relevant and material circumstances which it may be

necessary to develop. We find and conclude that this circumstance, standing alone, supports a finding of particularized need for the *in camera* disclosure to this Court which we shall order.

### III.

Neither Rule 6(e) nor the principles established by the Supreme Court cases which that rule codifies require that disclosure be made immediately to the party moving for disclosure. In other words, *in camera* examination by the Court under circumstances of a particular case is an appropriate and necessary exercise of discretion both for the purpose of ruling a motion for production and for the purpose of supervision of the process of production. *Dennis v. United States,* 384 U.S. 855, 874 and 875, 86 S.Ct. 1840, 1851 and 1851–52, 16 L.Ed.2d 973 (1966). In *National Dairy Products Corp., supra,* we stated our considered view of *Dennis* in regard to the use of *in camera* procedures as follows:

> *Dennis* did not purport to ban *in camera* examinations by the trial judge. The established Second Circuit *in camera* examination impeachment procedure, first noted by the Supreme Court in both opinions in *Pittsburgh Plate Glass* by their respective citation of *United States v. Spangelet,* 2 Cir. 258 F.2d 338 (360 U.S. at 399 and 401, 79 S.Ct. at 1240 and 1241) was again noted in *Dennis. Dennis* stated with approval that the *in camera* examination feature of that impeachment procedure "may be useful in enabling the trial court to rule on a defense motion for production to it of grand jury testimony" (384 U.S. at 874, 86 S.Ct. at 1851). [262 F.Supp. at 464]

We added the following in regard to a case involving alleged inconsistencies between trial and grand jury testimony of a particular witness:

> *Dennis,* consistent with the fundamental rationale of all the earlier Supreme Court cases, recognized that if the trial judge in fact orders the grand jury transcript produced and if the trial judge in fact properly makes his required *in camera* examination for inconsistencies and properly finds none, his refusal then to permit inspection of the grand jury transcript by the defense is also proper. A defendant, of course, has the right to test on appeal the question of whether the trial court's judgment on what is essentially a factual question in regard to the existence or nonexistence of inconsistencies was right or wrong. Concepts of fairness and justice require no more. [*Id.* at 467]

We still adhere to the views we expressed over ten years ago and which we have applied in many cases, both civil and criminal, since that time. Any doubt about the available *in camera* procedure would seem to have been resolved by *United States v. Nixon,* 418 U.S. 683, 714, 94 S.Ct. 3090, 3110–11, 41 L.Ed.2d 1039 (1974), in which the Supreme Court in a different context stated that "[i]t is elementary that *in camera* inspection of evidence is always a procedure calling for scrupulous protection against any release or publication of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought." Compare *United States v. Cammisano,* 546 F.2d 238 (8 Cir.1976).

We believe that considerations of time, avoidance of delay, and recognition that disclosure should be kept under close judicial supervision and restricted to the least amount of disclosure necessary under the circumstances of a particular case require that our order of disclosure be limited at this time to our *in camera* examination of the grand jury material in order that we may determine what further orders, if any, should be made under the circumstances.

In closing, we reiterate for the record that our consideration of NFO's Rule 6(e) motion has been made without examination of any of the inventories forwarded to this Court pursuant to Chief Judge Spears' order of October 1, 1976, which was the sub-

ject of AMPI's November 29, 1976, motion, which was denied by Chief Judge Spears on June 29, 1978.

### IV.

For the reasons stated, it is

ORDERED (1) that NFO's Rule 6(e) motion should be and the same is hereby granted. It is further

ORDERED (2) that the disclosure ordered pursuant to Rule 6(e) shall at this time be limited to disclosure to the undersigned judge in order that he may personally make an *in camera* examination of the grand jury material so as to be in a position to make such other orders which may be necessary and appropriate under the circumstances. It is further

ORDERED (3) that this memorandum opinion and orders entered pursuant thereto shall constitute this Court's finding that there is a compelling need for *all* of the Western District of Texas grand jury subpoenas, transcripts, and documents, within the meaning of Chief Judge Spears' order of October 1, 1976, and shall constitute this Court's certification that the transfer of all that material is warranted under the circumstances. It is further

ORDERED (4) that a copy of this memorandum opinion and orders shall be immediately transmitted to Chief Judge Spears and to the Clerk of the Western District of Texas so that the transmittal of all grand jury materials shall be made as promptly as possible to this Court for its *in camera* examination.

/s/ John W. Oliver
Chief Judge

Kansas City, Missouri

July 7, 1978

### APPENDIX B

MEMORANDUM OPINION AND ORDERS DENYING AMPI'S MOTION FOR RECONSIDERATION, AND EVIDENTIARY HEARING AND DIRECTING FURTHER PROCEEDINGS

On July 7, 1978, this Court, pursuant to procedures then agreeable to all parties and to the Antitrust Division, considered and granted NFO's Rule 6(e) motion for release of the Western District of Texas grand jury materials. The interlocutory orders entered July 7, 1978, however, did not provide for public disclosure of any of the grand jury material; those orders limited the disclosure of that material to the undersigned judge so that I could make an *in camera* examination of that material in order to be in a position to make such other orders which may be necessary and appropriate under the circumstances.

Before commencing the contemplated *in camera* examination, the Court made inquiry of the parties and the Antitrust Division to ascertain whether anyone had any objection to the *in camera* inspection ordered July 7, 1978, and whether anyone wished to seek some sort of appellate review of the orders entered that day. AMPI, and AMPI alone, indicated that it did have objections and that it wished to file a motion for reconsideration.

The detail of the correspondence between the Court and counsel and the nature of the pleadings eventually filed by AMPI, including but not limited to its pending motion for reconsideration and evidentiary hearing, are accurately summarized in Volume 81 of the transcript of proceedings held in this case on July 19, 1978, which are incorporated in this memorandum opinion by this reference.

We have carefully considered AMPI's pleadings, AMPI's offer of proof and all matters which AMPI listed for consideration in connection with its pending motion. We have studied the entire transcript of the record on appeal to the Fifth Circuit and the briefs filed in the Western District of Texas and in this Court. We have not read the briefs filed in the Court of Appeals for the Fifth Circuit or in the Supreme Court but we are confident that we have considered all legal authority relevant to the questions presented. We have read or determined that we were familiar with all cases cited by AMPI in support of its

pending motion and are satisfied as a result of our careful consideration of all matters that our July 7, 1978, determination of NFO's Rule 6(e) motion was correct and required by applicable law.

AMPI's suggestions in support of its pending motion contends, contrary to the advice that AMPI's original response to the Court's inquiry as to what procedures should be followed, that this Court should have decided AMPI's Motion for Summary Disposition of NFO's Rule 37 Motion before deciding the Rule 6(e) Motion. In order to eliminate any possible procedural problems, we have carefully considered AMPI's Motion for Summary disposition, the briefs in support and in opposition and have concluded that such motion should be denied. An appropriate order in regard to that matter accordingly will be entered.

Careful study of all matters listed by AMPI which it desired to have considered in connection with its pending motion convinces us that AMPI has not made a sufficient showing as required by law for any further evidentiary hearing in addition to that already afforded AMPI. The data voluntarily produced by the Antitrust Division not only establishes that the Department of Justice had probable cause to request that a grand jury be impanelled for the purposes stated, but such additional factual data now before the Court establishes an additional and independent factual basis for this Court's finding of particularized and compelling need for its disclosure orders entered July 7, 1978.

There is no necessity to delay our *in camera* inspection until the Department of Justice responds to the subpoena which AMPI requested July 20, 1978, for the reason that if the Antitrust Division in Washington takes the same position in regard to paragraphs 3, 4, and 5 of AMPI's request for a subpoena as that taken by Mr. Sarbaugh in open court, this Court would sustain that position for the reason that AMPI has not made a sufficient showing for the discovery requested. This Court set forth

the applicable principles in *United States v. Cammisano,* 413 F.Supp. 886 and 433 F.Supp. 964 (W.D.Mo.1976). *See also United States v. Cammisano,* 546 F.2d 238 (8th Cir.1976), which vacated this Court's original dismissal of the indictment as reported in 413 F.Supp. 886, but which remanded the case for further consideration. The Court of Appeals opinion approved this Court's reading and application of *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and *United States v. Berrios,* 501 F.2d 1207 (2nd Cir. 1974).

The Court is cognizant of the fact that additional material may be forthcoming in connection with paragraph 2 of AMPI's request for subpoena and of the fact that the Department of Justice may elect to voluntarily produce additional data which may be within the scope of paragraphs 3, 4, and 5 of that request. This Court will, of course, review and consider any additional data which may be furnished in connection with AMPI's request for subpoena and if such data requires a change of view, this Court has power to make any appropriate order that may be required under the circumstances. This possibility does not constitute any valid reason for this Court's delay in commencing its *in camera* examination of the Western District of Texas grand jury material. Under the orders entered July 7, 1978, there is no possibility that this Court will order any public disclosure of the Western District of Texas grand jury material until it has completed its *in camera* examination. That *in camera* examination will obviously take a substantial amount of this Court's judicial time and will permit the Antitrust Division to supplement its voluntary filing in connection with paragraph 2 of AMPI's request for subpoena and to state its position in regard to paragraphs 3, 4, and 5 of that request.

The Court finds and concludes that there is no necessity for this Court to listen to the testimony of the four lawyers named in paragraph 6 of AMPI's list of matters to be

considered and the other unidentified Department of Justice attorneys and former attorneys to establish the data stated in AMPI's offer of proof. We find and conclude that if that large group of attorneys did testify in a manner which could be said to support AMPI's offer of proof, such testimony and AMPI's offer of proof are insufficient to carry the burden imposed by the legal authorities to which we have made reference.

Counsel have been fully advised of this Court's view of the necessity of taking every possible step that will prevent the impediment of the orderly trial of this case. The Court recognizes, of course, that practically every decision of a federal trial court, including but not limited to any claim of abuse of its exercise of the discretion vested in it by Rule 6(e) of the Federal Rules of Criminal Procedure, is subject to appropriate appellate review. The question of *when* interlocutory orders entered pursuant to Rule 6(e) may be subject to appellate review, and the extent of that review, are entirely different questions. The particular circumstances of this case require that any party who wishes to seek what may be premature appellate review of this Court's July 7, 1978 interlocutory order directing disclosure for the limited purpose of this Court's *in camera* examination must be scheduled, so far as possible, for a time which will not interrupt the orderly processing of this case, which is now in its second year of trial.

It is for that reason that we have devoted long hours outside the ordinary call of duty in order to decide AMPI's pending motion for reconsideration and evidentiary hearing at a time when the Court has all counsel present before it in open court.

For the reasons stated, it is hereby

ORDERED (1) that AMPI's motion for reconsideration should be and the same is hereby granted for the purpose of enabling the Court to review its July 7, 1978 memorandum opinion and orders entered that day and for the purpose of making a firm and definitive ruling of AMPI's pending motion for summary disposition of NFO's Rule 37 motion. It is further

ORDERED (2) that AMPI's motion for summary disposition of NFO's Rule 37 motion should be and the same is hereby denied. It is further

ORDERED (3) that after reconsideration of this Court's memorandum and orders granting NFO's Rule 6(e) motion and directing further proceedings, entered July 7, 1978, that memorandum and orders should be and the same are hereby reaffirmed and reinstated in precisely the same form as originally entered. It is further

ORDERED (4) that the portion of AMPI's motion for reconsideration which prays for an evidentiary hearing should be and the same is hereby denied. It is further

ORDERED (5) that AMPI's request for subpoena in aid of its motions for reconsideration and evidentiary hearing should be and the same is hereby denied. It is further

ORDERED (6) that the Court will today ascertain whether AMPI desires to seek what it may deem to be appropriate appellate review of any and all orders entered by this Court on July 7, 1978, or of any of the orders entered this day in connection with the motions which have been this day ruled. It is further

ORDERED (7) that the procedures and timetable to permit AMPI or any other party to seek what it or they may deem to be appropriate appellate review shall be in accordance with the procedures and timetable which this Court has heretofore stated on the record, as reflected in Volume 81 of the transcripts of proceedings in this case.

/s/ John W. Oliver
Chief Judge

Kansas City, Missouri
July 21, 1978

### APPENDIX C

### MEMORANDUM AND ORDERS DIRECTING FURTHER PROCEEDINGS IN REGARD TO THE WESTERN DISTRICT OF TEXAS GRAND JURY MATERIALS

I have completed my personal *in camera* examination of the grand jury materials

from the Western District of Texas and have made sixty pages of longhand notes in regard thereto. That examination has established a firm tentative impression that NFO has either seen or was afforded an appropriate opportunity to see substantially all of the documents received in evidence as grand jury exhibits by the Grand Jury 75–2, Western District of Texas.

It is appropriate, however, to record while it is fresh in my mind the reasons why I have formed that impression and to explain why I have concluded to enter the orders stated at the end of this memorandum opinion. Those orders are designed to establish procedures which will enable the Court and counsel for all parties to be satisfied that any and all problems which might arise in regard to the documentary evidence produced to the Grand Jury 75–2, Western District of Texas, need not be an occasion for any substantial interruption of the trial of this case.

The list of 480 grand jury exhibits and the other information transmitted pursuant to Chief Judge Spears' order of October 1, 1976, did not afford a sufficient basis to make a determination of what further procedures should be ordered in connection with the 56 boxes of grand jury materials received from the Western District of Texas. It was therefore necessary to read the transcripts of the testimony of all fifty witnesses who testified, a few more than once, during February, March, April, May, and June of 1975 and March of 1976, in order to find out where the various documents marked as grand jury exhibits had come from and who may have seen those documents prior to their production for grand jury examination. It became apparent quite early in my *in camera* examination of those transcripts that the government was utilizing material which had been collected from two principal sources.

The first source was material which had been gathered as a result of the disclosures made by Joseph H. Rose, Jr., and the subsequent discovery conducted in connection therewith by the parties in this case. My examination of the grand jury material suggests—indeed, almost establishes—that 31 of the total of 56 boxes forwarded from the Western District of Texas were received by the grand jury pursuant to orders entered by Chief Judge Spears from a room in the basement of the GPM Building in San Antonio, Texas. It is also reasonably clear that the contents of all of those 31 boxes had been earlier gathered for review by interested counsel, including counsel for NFO, in Room 208 of the GPM Building as a result of the discovery which followed the disclosures made by Joseph H. Rose, Jr. John C. Davidson made specific reference to the "many hundreds of transfer cases of original records revealed to the Government and private litigants on December 7, 1973, in room 208 of AMPI's headquarters building in San Antonio" on page 8 of his November 14, 1974, memorandum to John E. Sarbaugh, Chief, Midwest Office of the Antitrust Division. AMPI Exhibit 2 in the July 20, 1978 proceedings in this Court. We are confident that the 31 boxes came from the "many hundreds of transfer cases" in Room 208, all of which were later stored in the basement of the GPM Building and eventually placed in the custody of Grand Jury 75–2, Western District of Texas.

Included in that group of 31 boxes was material which had been forwarded to Room 208 by the law firm of Wright, Lindsey and Jennings of Little Rock, Arkansas. The boxes from the Wright firm contained back-up material which that firm used in preparing its Report to the Board of Directors of AMPI dated March 13, 1974. All counsel in this case, of course, received copies of the Wright Report shortly after its publication.

The second source of documents, other than the 31 boxes containing the Room 208 material, was David Donohoe of Rowley & Scott, counsel for NFO, and Robert E. Walls of the Fulbright & Jaworski firm, who represented the private party plain-

tiffs in the Texas cases. Indeed, the first 124 grand jury exhibits came from NFO and MAP counsel and included copies of many court papers filed as a matter of public record as a part of JPML Docket # 83 in this judicial district. Many of the other grand jury exhibits, introduced in connection with the testimony of later witnesses, were merely copies of similar public records, including but not limited to depositions and deposition exhibits taken by the parties following the disclosures made by Joseph H. Rose, Jr. Obviously, NFO has seen those documents.

Our study of the transcripts and a subsequent check with the Clerk's office in the Western District of Texas confirmed our tentative conclusion that Government Exhibit 457, a four-drawer file cabinet which was delivered to the grand jury on June 16, 1975, and which had been in the offices of a friend of Harold S. Nelson since on or about January 26, 1972, is still in San Antonio in the Clerk's office. The grand jury transcripts indicate that government counsel and the grand jury went through all four drawers of that file cabinet and did not find any documents which were given separate grand jury exhibit numbers. I have not concluded what should be done about the file cabinet which was overlooked and which still sits in the Great State of Texas.

Eight of the 56 boxes contain various grand jury exhibits which, for the most part, simply were transferred from one of the 31 box group to another box as a particular witness was asked about a particular document which originally came from Room 208.

Our *in camera* examination reveals that the government was insistent upon making detailed examination before the grand jury in connection with many factual matters which were reduced to stipulation in this Court on March 13, 1974, between NFO and AMPI with respect to issues raised in NFO's motion for sanctions. It is apparently true that ten, or perhaps eleven (one

box does not have a grand jury exhibit number), boxes and a handful of five folders and separately marked documents may have been produced to the Western District of Texas grand jury which may not have been available for examination by NFO counsel at some earlier time. The remaining boxes may fall into the same general category. Particular identifying markings of six of the boxes, however, when checked against logs before the grand jury, suggest that at least six of the boxes had in fact been in Room 208 and available for NFO examination.

Five small folders, each marked as a separate grand jury exhibit, were produced by Mr. Bain. Two additional grand jury exhibits related to separate documents which surfaced either during the depositions which followed the disclosure of Joseph H. Rose, Jr., or during the trial of *United States v. Stuart Russell* in July, 1975. One of the documents surfaced as an exhibit in Dr. Mehren's deposition.

The other document, originally marked Government's Exhibit 66 in the trial of *United States v. Russell* was the basis for NFO's motion to reopen discovery, filed February 24, 1977, and was presented to the grand jury pursuant to an by affidavit of Robert Isham. That affidavit contains an apparent explanation of why Isham's "Lists of Irregularities" did not contain the first three items on that list and why AMPI had never been able to produce what originally was marked as GX 66 in the *Russell* trial and later marked as GX 420 in the Grand Jury 75–2, Western District of Texas.

Our *in camera* examination of all of the material forwarded this Court under Chief Judge Spears' order of October 1, 1976, and our order of July 7, 1978, excepting only GX 457, the four-drawer file cabinet, which apparently contains some old personal papers of Nelson and which we have not yet examined, convinces us that appropriate procedures must be designed to test this Court's present impression that NFO has

either seen or was afforded an appropriate opportunity to examine virtually all of the material produced to Grand Jury 75–2, Western District of Texas, which may contain any documentary evidence which could conceivably be relevant or material to any of the questions of fact or issues of law presented in the litigation presently on trial in this Court. We do not wish to act upon impressions when those impressions may be tested by the procedures which we shall direct.

Accordingly, and for the reason stated, it is

ORDERED (1) that on or before Monday, August 7, 1978, the government shall prepare, serve, and file a list of documents received in evidence by Grand Jury 75–2, Western District of Texas, which shall state the government's best judgment as to the source of each grand jury exhibit. The information sought by the Court is to assist it in making an accurate determination as to whether NFO was in fact afforded an opportunity to examine a particular grand jury exhibit before its production to Grand Jury 75–2, Western District of Texas. The list shall contain appropriate columns which shall state:

1. The particular exhibit number.

2. Whether the exhibit came from one of the 31 boxes received by Chief Deputy Clerk Putnicki, Western District of Texas, all of which contained documents earlier available for NFO examination in Room 208 of the GPM Building.

3. Whether the exhibit was available for earlier NFO examination as a part of any of the proceedings in JMPL Docket # 83, including but not limited to discovery proceedings and depositions conducted therein, both before and after the Rose disclosures.

4. Whether the exhibit may have otherwise been available for earlier examination by NFO prior to the production of such exhibit to Grand Jury 75–2, Western District of Texas.

5. Whether the exhibit may never had been made available for NFO's examination prior to the production of such exhibit to Grand Jury 75–2, Western District of Texas.

6. Whether the government cannot, on the basis of its present information, state whether NFO may or may not have had an opportunity to examine a particular exhibit before its production to Grand Jury 75–2, Western District of Texas. It is further

ORDERED (2) that upon receipt of the government's list, counsel for AMPI will be afforded an immediate opportunity to make an *in camera* examination, under the Court's supervision, of all grand jury exhibits which appear on the government's list in columns 5 and 6 of its list as being exhibits which the government believes NFO has not seen or may not be certain that NFO has already been afforded an opportunity to examine prior to their production to Grand Jury 75–2, Western District of Texas. Such examination may be conducted in a relatively short period of time in light of the fact that AMPI will be examining documents with which it is already familiar. It is further

ORDERED (3) that on or before August 14, 1978, AMPI shall prepare, and be in a position to file on that date, a statement of whether it has any objection to an order which would permit NFO to examine the exhibits which AMPI will have examined during the week of August 7, 1978. It is further

ORDERED (4) that should AMPI's response state it has no objection to NFO's examination of the grand jury exhibits which AMPI will have examined during the week of August 7, 1978, appropriate orders will be entered which will permit NFO's examination in order to afford NFO an opportunity to determine whether it may wish to adduce any of the grand jury exhibits which it would be permitted to examine *in camera*, and under the supervision of the Court, in evidence in this case.

If NFO concludes from its *in camera* examination that it does not want to intro-

duce any of the grand jury exhibits in evidence, the matter of Grand Jury 75–2, Western District of Texas, may, as a practical matter, be behind us.

On the other hand, should NFO conclude from its *in camera* examination that it may wish to adduce one or more of the grand jury exhibits in evidence or otherwise to seek leave of Court to reopen discovery, appropriate procedures will be designed to permit NFO to make a necessary showing of good cause that discovery should be reopened under the circumstances. It is further

ORDERED (5) that should the government, AMPI, NFO, or any party conclude that they wish to seek what they may deem to be appropriate appellate review of this interlocutory order they shall advise the Court and all other parties, including the government, both orally and in writing, on or before Friday, August 4, 1978, in order that the Court may enter whatever stay order it may deem to be appropriate under the circumstances. We have established this relatively short deadline to permit the government's filing to be made as above scheduled on August 7, 1978, and to permit AMPI's *in camera* examination of particular grand jury exhibits during the week of August 7, 1978, as above directed. It is further

ORDERED (6) that there is no present need for any further disclosure of the grand jury materials other than that above ordered. It is further

ORDERED (7) that this matter be set for further proceedings on Monday, August 14, 1978, at 9:30 a.m. in Division I, Fourth Floor, United States Court House, Kansas City, Missouri.

/s/ John W. Oliver
Chief Judge

Kansas City, Missouri

August 2, 1978